**UNITED STATES of America, Plaintiff,**

**Sidney Williams, et al., Plaintiff–Intervenors,**

**v.**

**The CITY OF MONTGOMERY, ALABAMA, et al., Defendants,**

**Gordon M. Ledbetter and John D. Shumway, Defendant–Intervenors.**

**Carolyn JORDAN, etc., et al., Plaintiffs,**

**Sandra M. Pierce–Hanna, et al., Plaintiff–Intervenors,**

**v.**

**John WILSON, etc., et al., Defendants,**

**Gordon M. Ledbetter and John D. Shumway, Defendant–Intervenors.**

**Civ. A. Nos. 3739–N, 75–19–N.**

United States District Court, M.D. Alabama, N.D.

Aug. 25, 1989.

---

See also 731 F.Supp. 436.

Marybeth Martin, Employment Litigation Section, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff, U.S.

Thomas M. Goggans, Montgomery, Ala., for defendants-intervenors Gordon Ledbetter, et al.

Kenneth L. Thomas, Thomas, Means & Gillis, and Donald V. Watkins, Montgomery, Ala., for plaintiffs-intervenors, Sidney Williams, et al.

M. Wayne Sabel, Argo, Enslen, Holloway & Sabel, Montgomery, Ala., for plaintiffs-intervenors, Sandra Pierce–Hanna, et al.

Robert C. Black, and Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for defendants John Wilson, Emory Folman, and the City of Montgomery, Ala.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., and Montgomery City–County Personnel Bd. and Barbara Montoya.

David M. Smith, Gregory H. Hawley, Maynard, Cooper, Frierson & Gale, Birmingham, Ala. and George B. Azar, Azar & Azar, Montgomery, Ala., for defendants Folmar, Wilson, McGilvray, Eckerman, Cooper & Duffee.

Julian McPhillips, McPhillips, DeBardelaben & Hawthorne, and Gary E. Atchison, Montgomery, Ala., for plaintiff-intervenor Boyd.

MEMORANDUM OPINION

**MYRON H. THOMPSON,** District Judge.

On June 21, 1989, this court preliminarily found that the Chief of Police for the City of Montgomery, Alabama had refused to consider and select one of four police officers as a "deputy chief designate" for the city's police department because of those officers' prior connections with these consolidated cases which over the years have addressed charges of sex and race discrimination in the department. The court entered a preliminary injunction prohibiting the defendants—the City of Montgomery, Mayor Emory Folmar, and Police Chief John Wilson—from selecting a white male police officer for the position; the court also required that the defendants fashion, and submit to the court, an interim plan that would allow for the selection of a new deputy chief without regard to a candidate's sex, race, or connection with this litigation. These cases are again before the court on motions, filed by two classes of plaintiff-intervenors on behalf of the four officers noted above, asking that the court's injunction be made permanent. The court concludes, for the reasons that follow, that the preliminary injunction should be made permanent.

I.

The plaintiff-intervenors who have filed the motions on behalf of the four police officers challenge the designation by Chief Wilson of Major Roger Owens, a white male officer, to serve as a deputy chief of police. The intervenors consist of the "Pierce–Hanna intervenors," who represent a class of all female officers in *Jordan v. Wilson,* Civil Action No. 75–19–N, and the "Williams intervenors," who represent a class of all African–American officers in *United States v. City of Montgomery,* Civil Action No. 3739–N. The intervenors contend that Majors Sandra Pierce–Hanna and Irma Lisenby of the female class and Majors Sidney Williams and James Gamble of the African–American class were not given the same opportunity as Owens to compete for this position: the intervenors charge that Wilson did not consider these four majors for the position of deputy chief because of his desire to retaliate against them for their prior participation in these lawsuits. The plaintiff-intervenors allege violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e–3(a),[1] and of prior orders of this court prohibiting Wilson and other defendants in these lawsuits from retaliating against the four majors.[2] The events giving rise to this charge are as follows.

1. The anti-retaliation section of Title VII reads:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C.A. § 2000e–3(a).

2. By order dated November 25, 1986, in *Jordan v. Wilson,* Civil Action No. 75–19–N (M.D.Ala.), this court enjoined these same defendants from retaliating in any way against Pierce–Hanna or any other person bringing sex discrimination charges against the department. *Jordan v. Wilson,* 649 F.Supp. 1038, 1064 (M.D.Ala.1986). In addition, a separate settlement agreement between Major Gamble and the defendants includes a provision in which the defendants agree to refrain from retaliating against Gamble for his having filed a suit-in-intervention in *Jordan v. Wilson.* Finally, in an October 2, 1972

order in *United States v. City of Montgomery,* Civil Action No. 3739–N (M.D.Ala.), this court issued an injunction prohibiting retaliation in any manner against city employees participating in that case. *See* note 6, *infra.*

In addition to the retaliation claim, the Williams intervenors also contend that Wilson's selection of Owens violates Title VII on theories of racially disparate treatment and impact. The Pierce–Hanna intervenors similarly advance theories of relief on the grounds of sexually disparate treatment and impact. Both classes note, and the defendants do not dispute, that no woman and no African–American has ever served as deputy chief or in its equivalent past position. The Pierce–Hanna intervenors also contend that Wilson's selection of Owens violates an order of this court in *Jordan v. Wilson,* Civil Action No. 75–19–N (M.D.Ala.), dated January 14, 1987, which barred Wilson from evaluating Major Pierce–Hanna for promotion. Since the court finds that the intervenors are clearly entitled to relief on their Title VII retaliation charge, it does not address their other theories of relief.

In prior proceedings in these consolidated lawsuits brought under Title VII, this court has ordered the plaintiff-intervenors and the defendants to work together in an attempt to restructure the promotion system of the police department. *Jordan v. Wilson,* 649 F.Supp. 1038, 1063 (M.D.Ala. 1986) (*Jordan I*); *see also Jordan v. Wilson,* 667 F.Supp. 772 (M.D.Ala.1987) (*Jordan II*).[3] The present action relates to the upper ranks of the department.[4] Below Chief Wilson in the department hierarchy are two deputy chiefs, designated lieutenant colonels, who report directly to Wilson and are accountable to him alone, and who each supervise half of the department's operations. One of the deputy chiefs supervises the "operations" side of the department, while the other supervises the "staff" side of the department. In general, the operations side of the department deals with direct law enforcement procedures and includes the patrol and investigative divisions, while the staff side is more administrative in character. Below the deputy chiefs are the majors, who each command a particular division within the police department. Each major reports directly to one of the two deputy chiefs.

In early 1989, one of the current deputy chiefs, Edward B. Alford, made known his intention to retire this coming September. At some point prior to this announcement, Wilson had contacted Major Ricky Mobley, a white male officer, to inquire if he was interested in the deputy chief position upon Alford's eventual retirement. To Wilson's disappointment, Mobley expressed no interest in the position. After confirming Alford's formal announcement, Chief Wilson then contacted Major Owens, another white male officer, to see if he would accept Alford's position. Owens told Wilson that he would accept the position if offered it, and Wilson decided to recommend Owen's name to Mayor Folmar for the mayor's approval.[5]

Wilson arrived at his decision to designate Owens for deputy chief in a seclusive manner. He did not announce to the department that Alford's position would be opening in the fall. He did not inform the majors or any other members of the department that he would consider them as candidates for the position; he did not ask them if they were interested in the position; nor did he conduct any interviews for the position. Wilson also did not refer to any formal list of job qualification criteria for the deputy chief position; instead, he made a subjective judgment of who was the best candidate for the job. Owens was not the clearly obvious choice for the position, however, since Wilson stated at the hearings on these motions that he found Owens to be only "a shade better" than Pierce–Hanna,

**3.** An intervening defendant class composed of white male members of the department, represented by two white male police officers hereinafter referred to as the "Ledbetter intervenors," have also participated in the motions now before the court, as well as in the effort to structure a promotion plan for the department. Another defendant in these consolidated actions which has participated in the effort to design a promotion plan is the Montgomery City–County Personnel Board. The Personnel Board did not participate in the motions addressed in this opinion.

**4.** The court notes that the defendants have not contended in this litigation that the position of deputy chief falls outside the definition of an "employee" under Title VII, § 2000e(f). Title VII excludes appointees on policy-making levels and advisers who are immediately and directly accountable to elected officials. *See, e.g., Teneyuca v. Bexar County,* 767 F.2d 148, 151–52 (5th Cir.1985); *E.E.O.C. v. Reno,* 758 F.2d 581, 584 (11th Cir.1985); *Curl v. Reavis,* 740 F.2d 1323,

1328 (4th Cir.1984); *Owens v. Rush,* 654 F.2d 1370, 1375–76 (10th Cir.1981); *Ramirez v. San Mateo County,* 639 F.2d 509, 513 (9th Cir.1981). Chief Wilson, who is not an elected official, testified at the preliminary injunction hearing that the deputy chiefs are accountable only to him.

**5.** The mayor bears ultimate responsibility for making recommendations on police department promotions to the Montgomery City Council, which has never rejected one of the mayor's nominees.

Although the court at times in this opinion will discuss Chief Wilson's "selection" of Owens, Owens's name has not been sent to the City Council for formal approval and he does not now hold the position of deputy chief. The defendants have made clear their intention to promote Owens to this position, however, depending on the outcome of this litigation. As stated in the text, the court on June 21, 1989, preliminarily enjoined the defendants from promoting Owens to deputy chief.

Lisenby, Williams, and Gamble in terms of qualifications for deputy chief.

## II.

■ Title VII expressly protects employees against retaliation by their employer for engaging in protected activity under Title VII.[6] Analytically, courts treat retaliation claims in the same manner as claims arising under Title VII's other proscriptive sections. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986).[7] Thus, under the framework recently announced by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), if the plaintiff-intervenors present direct evidence that retaliatory intentions played a substantial, motivating factor in Chief Wilson's adverse employment decision, then the burden shifts to the defendants to prove by a preponderance of the evidence that Wilson would have made the same decision even if he had not allowed retaliation to enter into his decisionmaking process. *Id.*, 490 U.S. at ——, 109 S.Ct. at 1788–89, 1795 (Brennan, J., plurality opinion); *id.*, 490 U.S. at ——, 109 S.Ct. at 1798–99, 1804 (O'Connor, J.,

concurring in the judgment). *See also Jones v. Gerwens*, 874 F.2d 1534, 1539 n. 8 (11th Cir.1989). If the defendants fail to sustain this burden, then the plaintiff-intervenors have established liability under Title VII.[8]

## III.

### A.

■ The plaintiff-intervenors acting on behalf of Majors Pierce–Hanna, Lisenby, Williams, and Gamble have established their claim of retaliation under Title VII. First of all, the intervenors have shown that each of the four officers has engaged in statutorily protected activity by participating in some manner in these two Title VII cases. Major Williams is the representative of the class of African–American police officers who charged that the department's promotion policies are racially discriminatory. *See Sims v. Montgomery County Commission*, 686 F.Supp. 878 (M.D.Ala.1988) (discussing the history of the Williams class proceedings). Major Pierce–Hanna is the representative of the

6. As noted earlier, *see* note 2, *supra*, the plaintiff-intervenors base their retaliation claim on prior orders of the court as well as Title VII. Since the intervenors have not offered any reason for treating a retaliation claim under the prior orders any differently from one under Title VII, the court has proceeded as if the intervenors' claim arises only under Title VII.

7. The court proceeds in this opinion to analyze the intervenors' challenge to Chief Wilson's decision under the analytical framework established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In so doing, the court understands the intervenors essentially to present four individual claims for relief. This understanding follows from the briefs of the parties and the apparent theory of the intervenors' cases at the hearing on this matter.

As the Supreme Court noted in *Price Waterhouse*, a somewhat different analytical approach typically applies to class actions premised on a pattern and practice of discrimination. 490 U.S. at ——, 109 S.Ct. at 1787 n. 10 (Brennan, J., plurality opinion); *id.*, 490 U.S. at ——, 109 S.Ct. at 1799 (O'Connor, J., concurring in the judgment). *See Cooper v. Federal Reserve Bank*, 467 U.S. 867, 876, 104 S.Ct. 2794, 2799–800, 81 L.Ed.2d 718 (1984) (focus in usual class action suit is not on individual hiring decision but on

pattern of discriminatory decisionmaking). Although the court follows the individual claim analysis in this opinion, it would reach the same result under a broader theory of a pattern of retaliatory decisionmaking. The same evidence discussed in the text of this opinion demonstrates that the defendants have engaged, at least since Major Pierce–Hanna filed her sex discrimination charges, in a persistent pattern of retaliation against female officers and African–American officers who have challenged in court practices which they believe violate Title VII.

8. As will become apparent, this so-called "mixed motives" framework applies in this case in contrast to the alternative analysis set out in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256–58, 101 S.Ct. 1089, 1095–96, 67 L.Ed.2d 207 (1981), which is appropriate in cases involving circumstantial evidence of discrimination where the inquiry is whether the proscribed discrimination was the true, sole basis for the decision. *See Price Waterhouse*, 490 U.S. at ——, 109 S.Ct. at 1788–89 (Brennan, J., plurality opinion); *id.*, 490 U.S. at ——, 109 S.Ct. at 1795–96 (White, J., concurring in the judgment); *id.*, 490 U.S. at ——, 109 S.Ct. at 1805 (O'Connor, J., concurring in the judgment); *Jones v. Gerwens*, 874 F.2d at 1539 n. 8.

class of female police officers who charged that the department's promotion policies are sexually discriminatory. *See Jordan v. Wilson*, 851 F.2d 1290, 1291 (11th Cir.1988) (per curiam) (discussing the history of the Pierce–Hanna litigation); *Jordan II*, 667 F.Supp. 772 (M.D.Ala.1987) (same); *Jordan I*, 649 F.Supp. 1038 (M.D.Ala.1986); *see also Jordan v. Swindall*, 105 F.R.D. 45 (M.D.Ala.1985).

Major Gamble intervened in the *Jordan* case in the fall of 1988, claiming that city officials retaliated against him in violation of 42 U.S.C.A. §§ 1983 and 2000e–3, because he refused to join them in a scheme to retaliate against Pierce–Hanna for her role in this litigation. Gamble and the defendants settled this suit in the midst of trial.[9] Finally, Major Lisenby testified against these same defendants in Gamble's trial and in the Stage II proceedings for individual relief following the court's class-wide findings of sex discrimination in *Jordan I*.[10]

**9.** In a companion order entered this date, the court denies a motion to enforce this settlement agreement filed by the defendants, in which they claim that Gamble is contractually prohibited from pursuing his retaliation claim in the proceeding at hand.

**10.** A plaintiff's discrimination suit need not be meritorious to support a subsequent claim of retaliation under § 2000e–3(a). The essence of a retaliation claim under Title VII is that the plaintiff is being punished for participating in any significant way in a suit challenging the employer's practices, regardless of the ultimate success of that endeavor. *See, e.g., Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir.1989). A plaintiff need only have had a reasonable belief that the defendants had committed an unlawful employment practice under Title VII to come within the coverage of § 2000e–3(a). *Id.*

**11.** Denials of promotional opportunities on a retaliatory basis are actionable as adverse employment decisions under § 2000e–3(a). *See, e.g., Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397 (11th Cir.1989) (per curiam).

The defendants nevertheless assert that the move from major to deputy chief is not a "promotion" but a "transfer." To the extent that this contention relates to whether the deputy chief position is included in the category of positions within the police department subject to the interim promotion plan previously ordered by this

### B.

The plaintiff-intervenors have also established that statutorily protected activity—the participation of the four complaining majors in these two lawsuits—was a substantial, motivating factor in Chief Wilson's refusal to consider the four majors for the position of deputy chief.[11] The intervenors have presented direct evidence that Wilson based his selection of Owens at least in substantial part, if not completely, on retaliatory grounds.[12] At the hearing held on the plaintiff-intervenors' requests for a preliminary injunction in this matter, Chief Wilson testified that one of the reasons why he selected Owens was that he was not "controversial." In Wilson's words, he selected Owens because, "He's never been the center of controversy in any of these proceedings or any others." The court is convinced that this statement, taken in context, signifies that Wilson intended to choose only someone for deputy chief who had not in the past participated in lawsuits challenging the employment prac-

court, *see Jordan II*, 667 F.Supp. at 779–81, the plaintiff-intervenors do not posit that the deputy chief position is so covered. Insofar as the defendants suggest that Chief Wilson's failure to consider these majors for the deputy chief position is not an adverse employment decision, the court rejects the assertion. The deputy chief position entails substantially greater duties than those involved in the position of major, with accompanying greater prestige. The deputy chief position also carries an additional salary of $8,000 to $10,000 above that of major. In any event, the court has repeatedly considered transfers as well as promotions as falling within the scope of these litigations. *See Jordan I*, 649 F.Supp. at 1038, 1062 n. 19; *see also* Order of June 12, 1987, *Jordan v. Wilson*, Civil Action No. 75–19–N (M.D.Ala.) (finding that transfers, among other things, were properly addressed in *Jordan I* ).

**12.** Although the question of whether a plaintiff has presented direct evidence is not always entirely clear, direct evidence may be defined as actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee. *See Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 *reh'g granted and opinion amended in unrelated respects* 848 F.2d 1522 (11th Cir.1988) (per curiam); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

tices of the police department; that is to say, that Wilson intentionally excluded Majors Gamble, Williams, Pierce–Hanna, and Lisenby precisely because they had sued Wilson, the city, and other city officials under Title VII.

Wilson attempted to qualify this statement both at the preliminary injunction hearing and at the permanent injunction hearing, by claiming that he meant only that Owens was well-liked in the department and that he was "well-rounded." Wilson also stated that Owens was noncontroversial in the sense that he had never been accused of racial or sexual discrimination. Wilson further stated that he did not consider Williams, Pierce–Hanna, Lisenby, and Gamble to be controversial. The court is not convinced by Wilson's alternative explanations for his statement. As the court noted in its order granting a preliminary injunction, "Anyone casually familiar with the history of this litigation and the prominent role it has played in the police department would have to conclude that Wilson could only have been referring to this litigation and those connected to it, and, in particular, Williams, Pierce–Hanna, Gamble, and Lisenby. Indeed, Wilson himself [originally] defined a controversial person as one at 'the center ... in any of these proceedings.' "

The record contains other evidence which could be construed as direct evidence of retaliatory factors in Chief Wilson's decisionmaking process. For instance, at certain points in the hearings held on these motions, Wilson drew a distinction between the controversial nature of these four majors to Wilson personally and their controversial nature within the department. Whether cast in terms of personal animus or in the cloak of departmental appearances, however, the controversial nature of these majors, derived directly from their connection with these lawsuits, is an illegitimate criterion to consider in making employment decisions about them. As the court has noted before, there may be some members of the police department who consider Williams, Pierce–Hanna, Gamble, and Lisenby to be controversial by virtue of their appearances before this court. However, to allow this fact to weigh against their opportunity for advancement in the department would be to blame those who consider themselves victims, and have been found in several instances to have been victims, of employment discrimination, for their acts of challenging the perceived wrongs. These four majors owed no duty to the department to sit silently by while, in their view, the department engaged in violations of the civil rights laws. They have consistently acted responsibly in stating their reasonable beliefs that they or their colleagues were suffering the indignities of discrimination. Their outspoken participation in these lawsuits, regardless of how unpleasant the result may have been for the department, should not, and cannot, be held against them. To the extent that Wilson considered their controversial nature within the department in refusing to consider and select them for the position of deputy chief, this is further direct evidence of retaliation in violation of § 2000e–3(a).

Finally, the record reflects another incident which could be construed as direct evidence of retaliation playing a motivating role in Wilson's refusal to consider and select Major Williams as deputy chief. After Wilson made his tentative decision to designate Owens as Alford's replacement, he informed all the majors in the department that he would contact them individually for input on, among other things, his decision to promote Owens. Prior to Wilson's public announcement of Owens as his choice for deputy chief designate, Major Williams informed Wilson by letter that he wished to be considered for the deputy chief position. Wilson, however, immediately assumed that this letter was a prelude to more litigation by Williams. He angrily rejected Williams's request and deemed it to be a personal insult and an affront to his decisionmaking authority. Rather than contact Williams directly regarding his formal application for the deputy chief position, Wilson contacted Deputy Chief Alford and instructed Alford to find Williams and "remind him how he got promoted to major." Wilson and Folmar both testified at the hearing on this matter that

they viewed the promotion of Williams to major over white candidates ranked above Williams to be an attempt by the city to put an end to Williams's role in this litigation. In this context, Wilson's "reminder" to Williams reasonably signified that Wilson would not consider Williams for future promotions because he and the city had already given Williams all they intended to as a result of his litigation.

### C.

In addition to their direct evidence, the intervenors also presented substantial circumstantial evidence of retaliation in the department. Several officers testified to the existence of a continuing hostile, negative work environment at the department resulting from the challenges to the discriminatory employment practices of the department.[13] This hostility has started at the top of the police department hierarchy and trickled down to all levels. Both Folmar and Wilson, for example, have prominently signalled their feelings about Pierce–Hanna by displaying to this day on the walls of their respective offices framed copies of a public letter signed by female members of the department opposing the prosecution of Pierce–Hanna's sex discrimination suit against the department. As the court explained in *Jordan II*, 667 F.Supp. at 778:

> The message to all in the department who see the display or who hear about the display, is clear: that these female police officers whose names are listed in the advertisement are the "loyal favored," at least among the women in the department and, correlatively, that those female officers whose names are not listed are not among the favored.

Indeed, the evidence reflects that Deputy Chief Bay Mallory, who is next in command to Chief Wilson, stated matter-of-factly at a staff meeting that a certain female officer would never be promoted by the department because she had failed to sign this letter. Mallory also stated at the hearings

held on the pending motions that it was the common feeling of members of the department that anyone who did not sign the letter would be viewed as "throwing stones," and as "not being in your corner."

Deputy Chief Mallory also threatened Lisenby just before she was to give testimony in suits against the department, accusing her of having "jumped ship" and of being "no longer loyal to the police department or the administration." Mallory warned her that she and her division would no longer enjoy the "favorable treatment" they had received in the past. Moreover, when Chief Wilson learned of Mallory's comments to Lisenby, he took no action against Mallory. And in a similar vein, Mayor Folmar has expressed deep disappointment with Major Lisenby's testimony in these two cases. He stated that she "led the charge for me against the sex discrimination [lawsuit]," but that, in light of her recent testimony in these cases, he no longer viewed her as loyal.

The defendants, however, argue that Mayor Folmar's views on Majors Pierce–Hanna and Lisenby are no longer relevant to the issue of retaliation in the selection of Major Owens. Folmar testified that, in February 1989, he withdrew from the day-to-day operations of the department. *See Jordan I*, 649 F.Supp. at 1048 (detailing Folmar's prior relationship with the department). Folmar stated that Wilson is now primarily responsible for all departmental operations, including promotions. Folmar testified that, while by law he has the last word on all promotions, he would have approved whomever Wilson recommended for the deputy chief position. Wilson also testified that, in light of the mayor's new "hands-off" policy, he would have designated a candidate for deputy chief even if he knew the mayor would oppose that candidate. The court is not convinced, however, that the mayor's preferences played no part in Wilson's selection of Owens; the court is convinced that Wilson would have been most reluctant to recommend to the mayor a candidate whom the mayor had

---

**13.** The plaintiff-intervenors note that this more recent evidence of a hostile environment takes on even more meaning when set against the backdrop of the past retaliation detailed in *Jordan I*, 649 F.Supp. at 1060–61.

openly considered to have been particularly "disloyal" to him in these two lawsuits— someone such as Pierce–Hanna or Lisenby. Such a recommendation would have been viewed by both Folmar and Wilson as a personal affront to the mayor. The court firmly believes that Wilson considered this fact and intentionally sought to avoid such a situation; indeed, Wilson indicated as much when he testified that Owens was selected because he was not "the center of controversy in any of these proceedings."

The court therefore concludes that the plaintiff-intervenors have established their claim of retaliation against Majors Pierce–Hanna, Williams, Lisenby, and Gamble on the part of Chief Wilson through both direct and circumstantial evidence. To avoid liability under Title VII, the defendants now bear the burden of proving by a preponderance of the evidence that Wilson would have reached the same decision to name Major Owens as Alford's replacement, even without the retaliatory factor underlying his actual decision. *Price Waterhouse*, 490 U.S. at ——, 109 S.Ct. at 1787–88 (Brennan, J., plurality opinion); *id.*, 490 U.S. at ——, 109 S.Ct. at 1795 (White, J., concurring in the judgment); *id.*, 490 U.S. at ——, 109 S.Ct. at 1976 (O'Connor, J., concurring in the judgment).[14] For the following reasons, the court finds that the defendants have not carried this burden.

## IV.

■ To assess fairly whether Chief Wilson would have named Major Owens as deputy chief designate absent any intent to retaliate against the four complaining majors, the court must look to the criteria on which Wilson purportedly relied. Wilson concedes that he did not refer to any formal, written list of criteria in arriving at his decision. At the preliminary injunction stage of this proceeding, the court noted from Wilson's testimony that he relied on three factors in deciding on Owens: Owens's attention to detail, his seniority, and his lack of involvement in controversy.[15] The last of these is the factor representing impermissible retaliation. Thus, the defendants must prove that Wilson would have chosen Owens without considering the "controversial nature" of any of the candidates. At the hearings on the pending motions, Wilson came up with several other factors on which he purportedly relied in choosing Owens: his dedication to the police department, his articulateness, his education, his personality, and his health. Later in his testimony, Chief Wilson added that his criteria were consistency in office and whether the candidate would carry out his policies. Finally, in response to questions from the court as to why Wilson chose Owens specifically over Gamble, Lisenby, Pierce–Hanna, and Williams, Wilson noted Owen's involvement in many different areas of the police department. The court will attempt to assess each of these proffered bases for Chief Wilson's decision to see whether Owens would have been chosen despite the influence of a retaliatory motive.

**14.** The Supreme Court did not reach a majority on the required strength of the connection between prohibited motive and the decision reached. *Compare Price Waterhouse*, 490 U.S. at ——, 109 S.Ct. at 1787 (Brennan, J., plurality opinion) (plaintiff must show that prohibited rationale "played a motivating part in an employment decision") *with id.*, 490 U.S. at ——, 109 S.Ct. at 1795 (White, J., concurring in the judgment) (plaintiff must show that prohibited rationale "was a *substantial* factor in the adverse employment action") (emphasis in original) *and id.*, 490 U.S. at ——, 109 S.Ct. at 1805 (O'Connor, J., concurring in the judgment) ("plaintiff must produce evidence sufficient to show that an illegitimate criterion was a substantial factor in the particular employment decision such that a reasonable factfinder could

draw an inference that the decision was made 'because of' the plaintiff's protected status"). *See also Jones v. Gerwens,* 874 F.2d at 1539 n. 8. This court finds that the plaintiff-intervenors' evidence in this case is clearly such that a reasonable factfinder could conclude that Wilson's decision was made because of the activities of the plaintiff-intervenors in the lawsuits before this court. Since the evidence thus meets the more stringent standard expounded by Justice O'Connor in her concurrence, the *Price Waterhouse* framework is in any event applicable to this case.

**15.** Wilson also stated that he had a preference to choose his deputy chief nominee from the rank of majors. Each of the complaining candidates of course meets this criterion.

Of these sundry criteria, most are entirely subjective. These include attention to detail, dedication to the department, articulateness, personality, consistency in office, and whether the candidate would carry out Wilson's policies. One of the primary problems posed by subjective criteria in employment discrimination suits is that rigorous evaluation by the factfinder of the weight accorded these factors by the employer is extremely difficult. The Eleventh Circuit has noted before, in language applicable to the setting at hand, the difficulties encountered by courts in weighing an employer's proffered reliance on subjective criteria in justifying its employment decision.

> This circuit has frequently noted the problems associated with this type of worker assessment and noted that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal. The employee is left without any objective criteria to point to in order to show competence.

*Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir.1985) (citations omitted). *See also Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2797, 101 L.Ed.2d 827 (1988) (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in the judgment) (cautioning, in a disparate impact context, against "[a]llowing an employer to escape liability [under Title VII] simply by articulating vague, inoffensive-sounding subjective criteria"). Though *Miles* involved allegations of racial discrimination under Title VII, the appellate court's admonition to district courts to view with caution an employer's reliance on subjective criteria applies with full force to the claim of retaliation in this case.

Indeed, given that Chief Wilson was personally involved as a defendant in the past suits in which Majors Pierce–Hanna, Williams, Gamble, and Lisenby participated, the need for caution in weighing his reliance on subjective factors is all the more apparent. Wilson's ability to apply subjective criteria fairly is particularly suspect when viewed in the historical context of Major Pierce–Hanna's past charges of discrimination and retaliation. Wilson himself candidly admitted at an earlier stage of this lawsuit that he could not be objective in evaluating Pierce–Hanna's performance within the department. Because of this testimony, the parties agreed to the court's issuing an order which provided, "That the current Chief of Police, John Wilson, will not be involved in any selection process in which she [Pierce–Hanna] has applied for promotion." [16] Moreover, some of the circumstantial evidence noted above in this opinion, in particular the fact that Wilson still prominently displays the letter opposing Pierce–Hanna's suit in his office, provides further reason for caution in assessing his reliance on subjective criteria in evaluating members of the department who have participated in these litigations. Finally, the fact that, as the court's scrutiny of his decision has progressed, Wilson has claimed to rely on new and different criteria is cause for caution.

Proceeding with these concerns in mind, the court finds that none of these asserted subjective criteria materially supports the defendants' attempted proof that Chief Wilson would have chosen Owens for the job absent the influence of a retaliatory motive. As to the criteria of dedication to the department, articulateness, personality, and consistency in office, the evidence at trial did not reveal any discernible advantage held by Owens over Gamble, Williams, Lisenby, or Pierce–Hanna. While Owens is purportedly especially attentive to detail, the evidence shows that the other majors are also competent in this regard; indeed, Major Pierce–Hanna possesses exceptional recall of detail. Nor did the defendants provide any evidence showing that Owens

**16.** *See* note 2, *supra.*

was more likely than the other majors to carry out Wilson's policies as chief. The record contains no evidence that any of the other majors has ever failed to follow orders. Granted, each of them to varying degrees may have challenged certain policies of the department in the past—but the policies challenged were alleged employment practices forbidden by the mandate of Title VII. To the extent that Wilson's reliance on Owens's ability to carry out Wilson's policies derives from the fact that Owens has never openly challenged the practices of the department as discriminatory, as have Pierce–Hanna, Lisenby, Gamble, and Williams, this factor is obviously no more legitimate a basis for Wilson's decision than is his desire to avoid "controversial" figures.

The other factors expressed by Wilson at the hearings are somewhat more objective. These include Owen's seniority, his educational achievements, his health, and his involvement in many different divisions within the police department. The court heard evidence on each of these factors at the trial of this matter. None of these factors supports the defendants' burden of proving that they would have chosen Owens absent the influence of a retaliatory motive.

Seniority as a controlling factor would not mandate the selection of Major Owens. Owens has served in the police department roughly 19 and one-half years. Williams, on the other hand, has served in the department over 20 and Lisenby has served 18 and one-half years.[17] Looking at the length of time spent as a major, again Owens possesses no clear advantage over the intervenors. Owens was promoted to major in March of 1985; Gamble was promoted to major in 1982, and Lisenby was promoted to this position in February of 1986.[18]

The educational achievement criterion similarly does not support the defendants' contention that Wilson would have promot-ed Owens absent an intention to retaliate against the four complaining majors. Major Owens received his GED degree in 1967, and has taken a course in criminology at Troy State University, as well as courses at the police academy. Major Pierce–Hanna, in addition to numerous courses at the police academy, has a master's degree in criminal justice from Troy State. Major Gamble has a bachelor's degree from Troy State. Major Lisenby has also advanced toward a bachelor's degree from Troy State; she needs only 25 more hours of credit to complete her degree. Major Williams's educational background is at least as impressive as is that of Major Owens.

As to health concerns, the record contains no probative evidence demonstrating Owens's superiority in this respect. While the defendants did present anecdotal evidence relating to Owens's successful recovery from surgery, no evidence suggests that Williams, Gamble, or Pierce–Hanna suffer from any serious health problems whatsoever. While the parties did present some evidence relating to Lisenby's health, this evidence did not demonstrate any impairment of Lisenby's ability to serve as deputy chief.

The defendants also referred to the fact that one of the responsibilities assigned to the deputy chief position at issue in this action is preparation of the department's budget. The defendants stressed Owens's competence and experience in preparation of the budget for the traffic division. However, each of the intervenors has experience as division commander in budget preparation equivalent to that of Owens. In addition, Wilson stated that familiarity with the department's computer system was an important requirement for the deputy chief position. The evidence at trial established that Pierce–Hanna was especially proficient in computer use.

**17.** Major Gamble has served 16 years in the Police Department, and Major Pierce–Hanna has served 13 years.

**18.** Pierce–Hanna was promoted to major in March 1988, and Williams was promoted to major in June of 1988. The court need not consider, for the purposes of this opinion, the allegations of Majors Pierce–Hanna and Williams that they were passed over on more than one occasion for promotion in favor of other, less qualified individuals.

Chief Wilson's final stated criterion for choosing Owens is Owens's exposure to many different divisions within the department. When asked directly by the court why he chose Owens over each specific complaining officer, Wilson replied that this factor led him to his decision. Owens, however, has served in only two of the divisions within the police department, traffic and patrol. Each of the complaining majors has served in more divisions within the department than has Owens.[19] Major Owens did spend a significant amount of his time at the department in the patrol division, which is regarded as one of the most prestigious divisions and one of the divisions most conducive to upward advancement. However, each of the other four majors has also spent significant periods of time in patrol. Majors Gamble, Williams and Lisenby have all served as well in the detective division, which is also considered within the department as both prestigious and conducive to future promotions. In addition, the intervenors point out that the deputy chief position for which Wilson designated Owens involves supervision of the staff side of the department. The staff divisions include training and recruiting, records and communication, jail administration, internal affairs, and vice and narcotics. Owens has no experience in any of these divisions. Lisenby, Gamble and Pierce–Hanna, on the other hand, are all currently commanders of divisions in this side of the department and have all worked directly under Deputy Chief Alford in the department. Thus, Wilson's reliance on Owens's broad experience within the department does not stand up to close scrutiny.

Finally, the court's assessment of the qualifications of Majors Gamble and Owens under the criteria propounded by Wilson has been indirectly confirmed by the city itself. In 1986, Gamble and Owens, along with others, both sought the position of chief of police. A mayoral commission performed an evaluation of the candidates. The commission ranked Gamble fourth among candidates, behind Wilson and the two current deputy chiefs. Owens was not ranked among the top five candidates. The commission's ranking, however, only indirectly confirms the court's assessment of Gamble and Owens's qualifications because the evidence does not show what criteria the commission employed in reaching its determination.

In summary, the court has compared the qualifications of Owens against those of Pierce–Hanna, Lisenby, Williams, and Gamble under the criteria which Chief Wilson claims to have used in his decisionmaking process. On the basis of this assessment, the court finds that Pierce–Hanna, Lisenby, and Gamble are clearly more qualified than Owens, and that Williams is at least marginally more qualified than Owens; the defendants therefore have not shown by a preponderance of the evidence that Chief Wilson would have selected Major Owens as deputy chief absent any intention to retaliate against the other four majors for their past participation in lawsuits challenging the employment practices of the city.[20] As stated earlier, Wilson testified that Major Owens was only "a shade" better than the other four majors in his evaluation and selection of a deputy chief designate. Given the compelling evidence of retaliatory influences in Wilson's decision, given the narrow margin by which Wilson preferred Owens over the other four majors, and, finally, given the fact that judged

---

**19.** Major Williams has served in the patrol, detective, and community relations divisions. Major Lisenby has worked in patrol, detective, internal affairs, juvenile, and special services divisions. Major Gamble has served in the juvenile, vice and narcotics, detective, patrol, community relations, and jail administration divisions. Major Pierce–Hanna has served in the jail administration, patrol, juvenile, and recruiting and training divisions.

**20.** Were this not a "mixed-motives" case, *see* note 8, *supra*, the intervenors would bear the ultimate burden of proving by a preponderance of the evidence that Wilson's "true" reason for designating Owens as his choice for deputy chief was to retaliate against those majors who had participated in lawsuits challenging the defendants' past employment practices. Considering the evidence presented by the parties at the hearings on these motions, the court concludes that the intervenors plainly would have born this burden successfully.

by the nonretaliatory criteria employed by Wilson, the qualifications of the complaining majors are not inferior to those of Owens and are in many respects superior, the court must conclude that the defendants have failed to carry their burden of proof, and that, absent his retaliatory motive, Wilson would have found Pierce–Hanna, Lisenby, Williams, and Gamble more qualified than Owens and would have selected one of them for deputy chief designate.

### V.

 The court now turns to the appropriate relief to be awarded the plaintiff-intervenors.[21] Initially, the court finds that the intervenors' request that the court make permanent its preliminary injunction vacating the designation of Roger Owens as the new deputy chief is due to be granted.

 This leaves the question of how the department should proceed to fill the position which Alford is scheduled to vacate in September. From the findings made today —that, using Chief Wilson's criteria, one of the complaining majors and not Owens would have been selected for the position of deputy chief in the absence of the illegal motive—the intervenors are entitled to relief requiring that the defendants appoint one of the four complaining majors as the new deputy chief. *See Price Waterhouse*, 490 U.S. at ——, 109 S.Ct. at 1787 n. 10 (Brennan, J., plurality opinion). The inter-

venors commendably do not at this time seek such intrusive relief. Rather than asking the court to decide who should be named deputy chief based on Wilson's criteria, the intervenors seek more systemic relief: they want an open, fair process in which all majors, including Owens, can compete for the deputy chief position based upon new, more objective criteria. The intervenors' proposed relief will allow members of the department to compete for the deputy chief position without regard to race, sex or connection with these lawsuits. This accords with Congress's goal in passing Title VII "to drive employers to focus on qualifications rather than on [considerations prohibited by the statute]." *Id.*, 490 U.S. at ——, 109 S.Ct. at 1787 (Brennan, J., plurality opinion). This relief is also attractive because it preserves the involvement of the police chief and the mayor in the selection process. Under the intervenors' proposal, the chief and the mayor, not the court, still decide who should serve as deputy chief of the department.[22]

Furthermore, the court understands that the defendants, including the intervening class of white male officers, prefer the court to follow the intervenors' approach of allowing Wilson and the department to make the decision under a fair, institutional promotion system to the alternative of the court's choosing who should be deputy chief.[23] The parties thus appear to be in general agreement as to the relief to be ordered. The court will therefore make

**21.** It is of course a well-established principle that remedies which inure to victims of practices prohibited by Title VII must be sufficient to restore the injured employees "to a position where they would have been were it not for the unlawful discrimination." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (citations omitted). *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420–21, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (intent of Congress to give federal courts wide equitable discretion to fashion most complete relief possible); *see also United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 1073–74, 94 L.Ed.2d 203 (1987) (Brennan, J., plurality opinion) (commenting on equitable authority of court to redress employment discrimination).

**22.** By the same token, under this form of relief, the court may avoid the onerous task of choos-

ing, on the basis of Wilson's stated criteria with their limitations as detailed in the text, from among Pierce–Hanna, Lisenby, Williams, and Gamble.

**23.** The Ledbetter intervenors have so stated on the record. While defendants Wilson, Folmar, and the city have not expressly replied to the court's query on the record, it is the court's understanding that their preference is that the court adopt the intervenors' proposal for systemic relief. If the court is mistaken in this regard, these defendants should so inform the court within ten days of the date of this order. Upon such a request, the court will then consider whether it should decide which of the four complaining majors should be named deputy chief.

permanent its preliminary injunction prohibiting the defendants from permanently appointing anyone to the position of deputy chief except under a court-approved plan.

In its order granting a preliminary injunction, the court recognized that if a new selection procedure is to be available in time for Alford's retirement, the defendants would have to move expeditiously to develop such a procedure. The court therefore ordered the defendants to begin developing a new, interim procedure, which would remain in effect until a more carefully crafted permanent plan could be developed. The court understands that the defendants have developed an interim procedure, and that the intervenors are in agreement with many aspects of this proposed procedure. The court will, however, allow the parties another opportunity to reach full agreement, if they can. The parties, in particular the defendants, are in the best position to develop a selection plan.

However, if the parties are still unable to reach full agreement, the court will itself fashion an interim procedure, after the parties have submitted relevant evidence, including their own proposed plans. As the court stated in its order granting a preliminary injunction, any proposed interim plan must include procedures to insure that the selection of the deputy chief is without regard to an officer's race, sex, or connection with this litigation. Furthermore, because, as the intervenors observe, Owens has received valuable training in the duties of Alford's deputy chief position, training which would most likely give him an unfair advantage in any competition for this position, any proposed interim plan must also include procedures by which Pierce–Hanna, Lisenby, Williams, and Gamble may receive the same or comparable training.

An appropriate judgment will be entered.

## JUDGMENT AND PERMANENT INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the Williams intervenors' March 24, 1989, request for permanent injunctive relief and the Pierce–Hanna intervenors' March 27, 1989, motion for supplemental relief, be and they are hereby granted;

(2) That it be and is hereby DECLARED that defendant John Wilson refused to consider and select Sandra Pierce–Hanna, Irma Lisenby, Sidney Williams, and James Gamble, because of their prior connection with these two lawsuits, in violation of 42 U.S.C.A. § 2000e–3(a);

(3) That defendants the City of Montgomery, John Wilson, and Emory Folmar be and are each hereby permanently ENJOINED and RESTRAINED:

(A) From failing to vacate the appointment of Roger Owens as deputy chief designate; and

(B) From making a permanent promotion to the rank of deputy chief except under a plan approved by the court;

(4) That a hearing regarding the establishment of a new, interim plan for selection of deputy chief be and is hereby set for September 11, 1989, at 10:00 a.m. in the second floor courtroom of the federal courthouse in Montgomery, Alabama;

(5) That the parties be and are hereby DIRECTED to submit to the court by September 7, 1989, their proposed interim plans, which shall include (A) procedures to insure that the selection of the deputy chief is without regard to an officer's race, sex, or connection with this litigation and (B) procedures by which Pierce–Hanna, Lisenby, Williams, and Gamble may receive the same or comparable training in the duties of the deputy chief position as Roger Owens has enjoyed; and

(6) That any requests for attorneys' fees must be filed within 21 days from the date of this order.

It is further ORDERED that costs of this proceeding are taxed to the city defendants, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.