**UNITED STATES of America, Plaintiff,**

Sidney Williams, et al., Plaintiffs–Intervenors,

v.

The CITY OF MONTGOMERY, ALABAMA, et al., Defendants,

Gordon M. Ledbetter and John D. Shumway, Defendants–Intervenors.

**Carolyn JORDAN, etc., et al., Plaintiffs,**

Sandra M. Pierce–Hanna, et al., Plaintiffs–Intervenors,

v.

John WILSON, etc., et al., Defendants,

Gordon M. Ledbetter and John D. Shumway, Defendants–Intervenors.

Civ. A. Nos. 3739–N, 75–19–N.

United States District Court, M.D. Alabama, N.D.

March 19, 1992.

Marybeth Martin, Philip Eure, Employment Litigation Section, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Randall C. Morgan, Montgomery, Ala., for City of Montgomery.

Robert D. Segall, Montgomery, Ala., for Montgomery City–County Pers. Bd.

Thomas M. Goggans, Montgomery, Ala., for defendants-intervenors white male police officers of City of Montgomery and Ledbetter.

Donald Watkins, Kenneth L. Thomas, Massey, Means & Thomas, Montgomery, Ala., for plaintiffs-intervenors Williams, et al.

Julian McPhillips, Kenneth Shinbaum, Montgomery, Ala., for Willie Davis.

J. Richard Cohen, Southern Poverty Law Ctr., M. Wayne Sabel, Argo, Enslen, Holloway & Sabel, Montgomery, Ala., for Pierce–Hanna & Oyler.

Robert C. Black, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for all defendants except Wade L. Moss and Montgomery City–County Personnel Board.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Wade L. Moss and Montgomery City–County Personnel Bd.

George B. Azar, Azar & Azar, Montgomery, Ala., for defendants Folmar, Wilson, McGil, Eckerman, Cooper & Duffee.

Julian McPhillips and Kenneth Shinbaum, McPhillips, DeBardelaben & Hawthorne, Montgomery, Ala., for Williams.

Gary E. Atchison, Montgomery, Ala., for plaintiff-intervenor Boyd.

Theron Stokes, Montgomery, Ala., for Atty. Sabel.

Vanzetta McPherson, Montgomery, Ala., for Tommi Alford.

## MEMORANDUM OPINION

### MYRON H. THOMPSON, Chief Judge.

In these two long-standing class-action lawsuits, officers in the Police Department of the City of Montgomery, Alabama seek redress for the department's sexually and racially discriminatory employment practices. The defendants to this litigation are the City of Montgomery and its mayor and police chief. This litigation is based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17, and on the equal protection clause of the fourteenth amendment to the United States Constitution as enforced through 42 U.S.C.A. § 1983. The court has certified two plaintiff classes pursuant to Rule 23(a) & (b)(2) of the Federal Rules of Civil Procedure: in *Jordan v. Wilson*, civil action no. 75–19–N, a plaintiff class of all female officers in the Montgomery Police Department, and in *United States v. City of Montgomery*, civil action no. 3739–N, a plaintiff class of all African–American officers in the department.

These two lawsuits are again before the court, this time on claims filed by two officers in the police department. Major Sandra Pierce–Hanna, who is both a member of the class of female officers and its named representative, claims that the defendants refused to select her as a deputy chief because of her participation in this litigation and because of her sex; and Major James E. Gamble, who is a member of the class of African–American officers, similarly claims that the defendants refused to select him for the same position because of his participation in this litigation and because of his race. Gamble also charges that the manner in which the defendants made their selection violated a court-ordered selection plan. For the following reasons, the court concludes that Pierce–Hanna's retaliation claim has merit and that Gamble's claims all lack merit.

## I. PIERCE–HANNA'S RETALIATION CLAIM

In August 1991, Mayor Emory Folmar and Police Chief John Wilson selected a new deputy chief for the police department. In doing so, however, they passed over Pierce–Hanna, the number-one-ranked officer under a court-ordered selection plan, to select Roger Owens, the number-two-ranked officer. Pierce–Hanna immediately filed an objection in this court, claiming that Folmar and Wilson had refused to select her because of her participation in this litigation and because of her sex. Because Pierce–Hanna's retaliation claim has merit, the court will limit itself to that claim and will not reach her sex-discrimination claim.

Pierce–Hanna rests her retaliation claim on the anti-retaliation provision of Title VII, 42 U.S.C.A. § 2000e–3(a),[1] and on a prior order of this court prohibiting the defendants from retaliating against participants in this litigation.[2] Because Pierce–Hanna has not offered any reason for treating a retaliation charge under a court order any differently from one under Title VII, the court has proceeded as if her claim arises only under Title VII.

In determining whether Pierce–Hanna's claim has merit under Title VII, this court

1. The anti-retaliation section of Title VII reads: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 U.S.C.A. § 2000e–3(a).

2. By order dated November 25, 1986, this court enjoined the defendants from retaliating in any way against Pierce–Hanna or any other person bringing sex discrimination charges against the department. *Jordan v. Wilson*, 649 F.Supp. 1038, 1064 (M.D.Ala.1986).

does not write on a clean slate. There is much relevant evidence, spanning from the early 1980's into the 1990's and already documented in court opinions, which depicts acts of retaliation and discrimination as well as acts of knowing and flagrant violation of court orders entered to redress these grievances. Because these acts were committed by, or at the instigation of, Mayor Folmar and Chief Wilson and because most of them were directed against Pierce–Hanna and those who could be viewed as having aligned themselves with her in this litigation, any fair evaluation of Pierce–Hanna's claim must be set within the context of this earlier evidence.

## A. Earlier Acts of Retaliation, Bias, and Flagrant Violation of Court Orders

*Mayor Folmar Retaliates against Pierce–Hanna.* In 1986, in response to a complaint brought by Pierce–Hanna on behalf of herself and other female officers in the police department, the court held that the department had systematically and intentionally discriminated against female officers in promotions, in violation of Title VII and the equal protection clause of the fourteenth amendment. *Jordan v. Wilson,* 649 F.Supp. 1038 (M.D.Ala.1986). The court found that "discriminating against women because they are women was and remains the 'standard operating procedure' within the City of Montgomery Police Department." *Id.* at 1058. The court ordered the department to develop new promotion procedures. *Id.* at 1063.

The court also found that Mayor Folmar had "concocted a department-wide scheme to discredit and embarrass ... Pierce[–Hanna] for having initiated the charges." *Jordan v. Wilson,* 667 F.Supp. 772, 776 (M.D.Ala.1987). As later capsulized by the court, the evidence relied upon in reaching this finding was as follows:

"Receiving their cue from the mayor, Pierce[–Hanna]'s supervisors suddenly began to give her extremely poor ratings, with the result that her ranking on the promotion register dropped precipitously and dramatically. The scheme was thus not subtle and hidden, but open, obvious and widespread so that everyone in the department could see that the penalty for 'disloyalty' was very great. It was based on open intimidation and had a two-fold purpose: first to punish Pierce–[Hanna] and force her out of the department; and second, to force others in the department to join the mayor in his vendetta against Pierce[–Hanna] and in his opposition to her lawsuit.

"The scheme, however, also had an element of reward to it. On one occasion the mayor rewarded two female officers for supporting him against Pierce[–Hanna], by promoting them while rejecting Pierce[–Hanna]."

*Id.* (citation omitted). Because "there [was] a strong probability of further retaliation" and because an injunction banning retaliation was not already outstanding, the court issued an order prohibiting Mayor Folmar and all police officials from retaliating against persons in the department and, in particular, from retaliating against Pierce–Hanna. *Jordan v. Wilson,* 649 F.Supp. at 1064. The defendants did not appeal.

In May 1987, the court approved and ordered implemented an interim plan for the police department. Under the plan, "if the mayor chooses to select a lower-ranked candidate over a higher-ranked candidate, even if all the candidates involved are women, he must state in writing his reasons for rejecting the higher-ranked candidate." *Jordan v. Wilson* 667 F.Supp. at 777. The female police officers are then given a period of time to challenge the objection as either sexually discriminatory or retaliatory. If an objection is made, "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge." *Id.* These provisions were based on findings that Mayor Folmar and others had engaged in a longstanding scheme against Pierce–Hanna and other female officers "to discourage [them] from pursuing discrimination claims and to retaliate against those who do." *Id.* at 776.

The court later learned in 1991 that Mayor Folmar's bias toward Pierce–Hanna was

even stronger than the court had realized. Later evidence revealed that, during the trial on Pierce–Hanna's claims in 1985, Folmar commented to some police officers that "he would fall on his sword and die before he would promote her."

*Chief Wilson Admits Retaliatory Bias against Pierce–Hanna.* At the trial on Pierce–Hanna's complaint in 1985, Chief Wilson, who was then only a major in the department, testified that, because Pierce–Hanna had brought a lawsuit against the department, he could not be objective in his assessment of her performance as an officer. Upon hearing Wilson's testimony, the department's then-Chief of Police prohibited Wilson from having any future input into the required periodic departmental evaluations of Pierce–Hanna. Later, in January 1987, based on Wilson's testimony, the court approved a decree, submitted by counsel for Pierce–Hanna and for the defendants, which provided, among other things, that "the current Chief of Police, John Wilson, will not be involved in any selection process in which Pierce–Hanna has applied for promotion." *Jordan v. Wilson,* civil action no. 75–19–N at p. 2 (M.D.Ala. January 14, 1987).

*Chief Wilson Retaliates against Pierce–Hanna and Three Other Officers.* In 1989, this litigation focused again on Pierce–Hanna. That year, one of the police department's deputy chiefs announced that he intended to retire. The department has two deputy chiefs: one supervises the "operations" side and the other the "staff" side of the department. In general, the operations side of the department covers direct law-enforcement procedures and includes the patrol and investigative divisions, while the staff side is more administrative in character. Below the deputy chiefs are the majors, who each command a division within the police department. Each major reports directly to one of the deputy chiefs. The retiring deputy chief supervised the "staff" side of the department. Chief Wilson appointed Roger Owens, a white male, as "deputy-chief designate," to assume the new position when the retiring deputy chief left on September 29, 1989.

In June 1989, in response to challenges made by two female officers and two black officers to the appointment, the court preliminarily found that Chief Wilson had appointed Owens, and had refused to consider and select one of the four other police officers, including Pierce–Hanna, in retaliation for the four officers' prior participation in this litigation. *United States v. City of Montgomery,* civil action nos. 3739–N and 75–19–N (M.D.Ala. June 21, 1989). Wilson testified that one of the reasons he had selected Owens was because he was not "controversial"—that is, according to Wilson, because "He's never been the center of controversy in any of these proceedings or any others." *Id.* at 6. The court understood Wilson to mean "that he wanted someone unconnected with this litigation, someone who had not become controversial through his or her support for, or opposition to, these cases—in short someone other than [the four complaining] officers." *Id.*

The court entered a preliminary injunction requiring that Folmar and Wilson develop an interim selection plan that would allow all eligible officers, including Pierce–Hanna and Owens, to compete for the deputy chief position without regard to a candidate's sex, race, or connection with this litigation. The court further required that, because Owens had received valuable training in the duties of deputy chief, training which would most likely give him an unfair advantage in any competition for this position, the selection plan must also include procedures by which the four complaining officers could receive the same or comparable training. Finally, as a part of the preliminary injunction, the court required that Folmar and Wilson vacate the appointment of Owens pending court resolution of the challenges to the appointment. The court included this last requirement because it wanted to be in a position to offer full relief should it ultimately find in favor of the complaining officers. The evidence reflected that "there are only two deputy chiefs and the positions open up for replacement only rarely" and that the "longer Owens remains in the position on a

permanent basis the less likely it is that the court would remove him." *Id.* at 13–14. Owens was allowed to continue as acting deputy chief only.

In August 1989, the court entered a memorandum opinion and injunction making final its earlier preliminary finding of retaliation against Pierce–Hanna and the other three officers. The court concluded that "Wilson intended to choose only someone for deputy chief who had not in the past participated in lawsuits challenging the employment practices of the police department." *United States v. City of Montgomery,* 744 F.Supp. 1074, 1080–81 (M.D.Ala.1989). The court continued its injunction against the appointment of Owens and continued its requirement that Mayor Folmar and Chief Wilson develop an interim plan for selection of deputy chief. *Id.* at 1088. The four complaining officers "commendably" did not seek to have the court "appoint one of [them] as the new deputy chief," even though they were entitled to such relief. *Id.* at 1087. The court explained that, "Rather than asking the court to decide who should be named deputy chief ..., the [four officers] seek more systemic relief: they want an open, fair process in which all majors, including Owens, can compete for the deputy chief position based upon new, more objective criteria." *Id.* The relief proposed by the complaining officers, the court continued, "will allow members of the department to compete for the deputy chief position without regard to race, sex or connection with these lawsuits." *Id.* The defendants appealed, and the Eleventh Circuit Court of Appeals affirmed the court's final injunction. *United States v. City of Montgomery,* 911 F.2d 741 (11th Cir.1990) (table).

*Mayor Folmar and Chief Wilson Display Further Bias and Retaliate against Others.* In early 1990, in response to a challenge filed by Pierce–Hanna on behalf of a fellow officer, Tommi Lee Alford, the court held that Chief Wilson had refused to promote Alford to the rank of captain "because of her prominent role in this litiga-tion." *United States v. City of Montgomery,* 755 F.Supp. 1522, 1531 (M.D.Ala.1990). The court required the defendants to promote Alford. *Id.* The defendants appealed and the Eleventh Circuit affirmed the court's decision. *United States v. City of Montgomery,* 934 F.2d 1265 (11th Cir.1991) (table).

More recently, in July 1991, in response to another claim filed by Pierce–Hanna on behalf of other members of the female class, the court held that the defendants had, in bad faith, refused to comply with two aspects of a 1988 consent decree. *United States v. City of Montgomery,* 770 F.Supp. 1523 (M.D.Ala.1991). First, the decree required the defendants to promote one female to lieutenant and another female to captain in 1990. *Jordan v. Wilson,* civil action no. 75–19–N at p. 5 (M.D.Ala. March 17, 1988). The defendants argued that, although the consent decree required that they make the promotions, they had no obligations to do so because no plan for promotions had been developed and the consent decree did not expressly require that they develop a plan. The court rejected the defendants' argument as "frivolous and disingenuous." *United States v. City of Montgomery,* 770 F.Supp. at 1526. The court wrote that "It ... logically and obviously follows that, if a plan had to be developed to make the promotions, it was the defendants' responsibility to do so." *Id.*

Second, the 1988 consent decree required that the defendants promote two other named female officers to the rank of sergeant in 1990. The defendants argued that they had not promoted the two officers because of their substandard performance. *United States v. City of Montgomery,* 770 F.Supp. at 1527. In rejecting the defendants' argument, the court relied on a earlier opinion in which the court had specifically instructed the defendants as to when and under what circumstances they may decline to promote an officer in the face of an order or consent decree that required that they do so.[3] The court wrote that it had previously instructed the defendants that "In the future ... the defendants

---

**3.** In the earlier opinion, the court rejected a female officer's challenge to the defendants' re-fusal to rescind her demotion and to promote her. The court found that, although the defen-

must seek formal court approval before taking any action which conflicts with any of the orders of the court." *Id.* at 1528 (emphasis deleted), *quoting Jordan v. Wilson,* 755 F.Supp. 993, 1001 n. 13 (M.D.Ala. 1990). In "flagrant disregard of this language and of their obligation under the 1988 consent decree," the court continued, "the defendants refused to promote [the two officers] in 1990 without obtaining prior approval of the court." *United States v. City of Montgomery,* 770 F.Supp. at 1528. "The defendants have not attempted to justify, or even explain, their actions," the court stated, but rather they "have approached this litigation as if the above cautionary instructions by the court did not exist." *Id.* The court characterized "the defendants' actions toward the required 1990 promotions [as being] part of a pattern of conscious disregard and violation of the orders of this court." [4] *Id.* The defendants did not appeal.

Finally, the evidence reflects that Wilson continues to prominently and officially signal his feelings about Pierce–Hanna by displaying to the public on the walls of his office a framed copy of a public letter signed by female officers opposing the prosecution of Pierce–Hanna's initial sex discrimination lawsuit against the department. As the court has explained before regarding this letter,

> "The message to all in the department who see the display or who hear about the display, is clear: that these female police officers whose names are listed in the advertisement are the 'loyal favored,' at least among the women in the department and, correlatively, that those female officers whose names are not listed are not among the favored."

*Jordan v. Wilson,* 667 F.Supp. at 778. Indeed, the evidence from earlier proceedings reflected that one of the department's deputy chiefs stated matter-of-factly at a staff meeting that a certain female officer would never be promoted because she had failed to sign this letter. The deputy chief later testified that it was the common feeling of members of the department that anyone who did not sign the letter would be viewed as "throwing stones," and as "not being in your corner." *United States v. City of Montgomery,* 744 F.Supp. at 1082.

This same deputy chief also threatened a female officer just before she was to give testimony in suits against the department, accusing her of having "jumped ship" and of being "no longer loyal to the police department or the administration." *United States v. City of Montgomery,* 744 F.Supp. at 1082. The deputy chief warned her that she and her division would no longer enjoy the "favorable treatment" they had received in the past. *Id.* Moreover, when Chief Wilson learned of the threat, he took no action against the deputy chief. And in a similar vein, Mayor Folmar has expressed deep disappointment with this female officer's testimony in these two cases. He stated that she "led the charge for me against the sex discrimination [lawsuit]," but that, in light of her recent testimony in these cases, he no longer viewed her as loyal. *Id.*

## B. Events Leading Up to Pierce–Hanna's Current Claim of Retaliation

In August 1990, after the Eleventh Circuit had affirmed the final order requiring

---

dants had failed to comply with the express provisions of a court order, relief would be denied to the female officer. *Jordan v. Wilson,* 755 F.Supp. 993 (M.D.Ala.1990).

**4.** In further support of this conclusion, the court explained that:

"Over the last three years, the Pierce–Hanna intervenors already have had to turn twice to this court to obtain the defendants' compliance with court orders. *See United States v. City of Montgomery,* 755 F.Supp. 1522 (M.D.Ala.1990) (officials of the City of Montgomery violated a court order by retaliating against a female officer, Tommi Lee Alford,

because of her participation in litigation against city officials), *aff'd,* 934 F.2d 1265 (11th Cir.1991) (table); *United States v. City of Montgomery,* 744 F.Supp. 1074 (M.D.Ala.1989) (officials of the City of Montgomery violated court order by refusing to promote one of several majors in the police department to the position of deputy chief because of their prior participation in litigation against city officials), *aff'd,* 911 F.2d 741 (11th Cir.1990) (table)."

*United States v. City of Montgomery,* 770 F.Supp. at 1528–29.

that the defendants establish new procedures for selecting a new deputy chief, this court approved and adopted an interim selection plan. *United States v. City of Montgomery*, civil action nos. 3739–N and 75–19–N (M.D.Ala. August 3, 1990). The plan is substantially parallel to the court-ordered interim-promotion plan previously adopted for ranks below that of deputy chief, with the exception that its reach is expanded to allow black officers as well as female officers to seek immediate court relief should the defendants discriminate or retaliate against them. Paragraph 7 of the deputy-chief plan provides that, "If the mayor passes over a higher-ranked candidate for a lower-ranked candidate, he must state his reasons for doing so in writing." The female police officers and the black police officers are then given a period of time to challenge the rejection as either sexually or racially discriminatory or retaliatory. Paragraph 7 further provides that, if there is a challenge to a selection, "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge."

In the spring of 1991, after almost another year without activity, Pierce–Hanna complained to the court on behalf of the class of female officers that Mayor Folmar and Chief Wilson were intentionally delaying implementation of the interim plan in order to keep Owens as acting deputy chief. In July 1991, the court entered an order requiring that Folmar and Wilson complete the ranking of the candidates for the position of deputy chief by July 31, 1991. Folmar and Wilson requested, and the court approved, a plan authorizing the police department to have the rankings done under the auspices of the Miami–Dade Criminal Justice Assessment Center.

In early August 1991, the Assessment Center completed its rankings, which, according to the Center, the police department could reliably use to conclude that a candidate ranked higher than another is, in fact, overall more qualified under the criteria used by the Center. Pierce–Hanna ranked first and Owens ranked second.[5] Chief Wilson, however, passed over Pierce–Hanna and recommended that Owens receive the appointment. In a letter written to Folmar on August 13, Wilson stated that he selected Owens over Pierce–Hanna because he excelled in the following areas: (1) organization and planning, interpersonal performance, and professional and technical performance; (2) seniority; (3) sincerity, resourcefulness, attitude, and motivation; (4) trustworthiness and dependability; and (5) acceptance of responsibility and challenge, and respect of subordinates. In his letter, Wilson also suggested that Owens has had broader "experience" than Pierce–Hanna. Folmar agreed with Wilson's reasons and approved the recommendation. Wilson and Folmar then had the city pay Owens $7,000 in backpay, that is, the additional amount he would have received had he assumed the position on an permanent basis on September 29, 1989. Wilson did this even though ¶ 7 of the selection plan expressly provided that "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge" and even though the Montgomery City–County Personnel Board had refused to confirm the reappointment because the board believed the reappointment violated ¶ 7. He also admitted in his testimony before the court that he was certain at the time of payment that Pierce–Hanna would file a court challenge to the selection and would seek a stay.

As expected, Pierce–Hanna quickly responded to the reappointment by filing a challenge on August 23, 1991, charging that Mayor Folmar and Chief Wilson had passed over her and selected Owens because of her sex and because of her participation in this litigation. Pierce–Hanna also requested that the court immediately require that Folmar and Wilson vacate the appointment of Owens pending resolution

5. The rankings of the top-five candidates were as follows:
   (1) S. Pierce-Hanna
   (2) R. Owens
   (3) D. Green
   (4) I. Lisenby
   (5) J. Gamble

of her challenge to the appointment. Folmar and Wilson refused to vacate the appointment voluntarily, arguing that the selection plan did not apply to the reappointment. On October 3, 1991, the court entered a final order requiring that the defendants vacate the appointment pursuant to ¶ 7 of the selection plan.[6] *United States v. City of Montgomery*, civil action nos. 3739–N & 75–19–N (M.D.Ala. October 3, 1991).[7] The court found the defendants' argument—that the selection plan did not apply to the reappointment—to be "disingenuous." *Id.* at 10. After noting that even the City–County Personnel Board had refused to process Owens' reappointment because it obviously violated the selection plan, the court reaffirmed the need for the plan: "First, evidence before the court reflected that Mayor Folmar and Chief Wilson had engaged in a continuous pattern of discrimination and retaliation against female officers, against those who participated in this litigation, and, in particular, against Pierce–Hanna, all in violation of court orders," *id.* at 11; and, "second, the court ... was concerned that the department has only two deputy chiefs and that the positions opened up for replacement

only rarely; should there be a challenge to Mayor Folmar's selection, the court did not want the person the mayor selected to acquire any vested interest in the position such that the court would be reluctant to remove him or her should the court find in favor of the challenge." [8] *Id.* at 12. The defendants did not appeal this final order.

### C. Pierce-Hanna's Current Claim of Retaliation

Title VII expressly protects employees against retaliation by their employers for engaging in protected activity under the Act. The defendants do not question that Pierce–Hanna's participation in this Title VII litigation is statutorily protected. *See* 42 U.S.C.A. § 2000–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has ... participated in any manner in [a] ... proceeding, or hearing under this subchapter"); *United States v. City of Montgomery*, 744 F.Supp. at 1080 (the participation of Pierce–Hanna in this litigation is statutorily protected).[9] They also have not questioned that the position sought falls within the definition of "employee" covered by Title VII.[10]

---

**6.** Pierce–Hanna filed a motion asking the court for a preliminary injunction vacating Owens's appointment. But at the hearing on the motion, the parties agreed that the court could treat the motion as asking for final relief pursuant to ¶ 7. *United States v. City of Montgomery*, civil action nos. 3739–N & 75–19–N at p. 9 (M.D.Ala. October 3, 1991).

**7.** With this order, Owens's salary reverted to the salary he had received before the reappointment.

**8.** The Montgomery City–County Personnel Board is independent of the City of Montgomery and therefore is not under the city's control.

**9.** Pierce–Hanna has also pursued some unsuccessful litigation in this court. In 1990, she filed a claim on behalf of a female corporal charging that the police department's decisions "to demote [the female corporal] temporarily to the rank of police officer and to deny her a promotion to sergeant" were retaliatory and in violation of the express provisions of a consent decree. *Jordan v. Wilson*, 755 F.Supp. at 995. The court found in favor of Folmar and Wilson. The court also recently rejected a claim by the class of black officers—of which Gamble has been an active member—that the police depart-

ment's new promotion procedures are racially discriminatory. *United States v. City of Montgomery*, 775 F.Supp. 1450 (M.D.Ala.1991). The fact that Pierce–Hanna and Gamble did not prevail in these proceedings does not mean that their conduct in these proceedings was not protected by Title VII. As this court has explained before:

"A plaintiff's discrimination suit need not be meritorious to support a subsequent claim of retaliation under § 2000e–3(a). The essence of a retaliation claim under Title VII is that the plaintiff is being punished for participating in any significant way in a suit challenging the employer's practices, regardless of the ultimate success of that endeavor. *See, e.g., Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir.1989). A plaintiff need only have had a reasonable belief that the defendants had committed an unlawful employment practice under Title VII to come within the coverage of § 2000e–3(a). *Id.*"
*United States v. City of Montgomery*, 744 F.Supp. at 1080 n. 10.

**10.** In the first round of the deputy-chief litigation, the court wrote that:

"The ... defendants have not contended ... that the position of deputy chief falls outside

Therefore, the only issue for the court is whether Mayor Folmar and Chief Wilson retaliated against Pierce–Hanna, that is, refused to appoint her as the new deputy chief because of this participation.[11]

The method of establishing a retaliation claim is essentially the same as for a claim of race or sex discrimination under Title VII. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir.1986). To assess her claim, therefore, Pierce–Hanna suggests two analytical frameworks commonly used under Title VII: the approach outlined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or, alternatively, the approach outlined in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The court will apply both approaches.

### 1. The *Burdine* and *McDonnell–Douglas* Approach

■■ An employee has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of evidence, which once established raises a presumption that the employer retaliated against the employee. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26. To establish a prima facie case, an employee must show that she was engaged in protected opposition to Title VII discrimination; that she suffered adverse treatment simultaneously with or subsequent to such opposition; and that there was a causal link between the protected opposition and the adverse treatment. *Donnellon*, 794 F.2d at 600–01.

■ If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer retaliated against the employee. This may be done by the employer articulating a legitimate, nonretaliatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *Burdine*, 450 U.S. at 254, 258, 101 S.Ct. at 1094, 1096; *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25.

■ Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for retaliation. The employee may satisfy this burden by persuading the court either directly that a retaliatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the

---

the definition of an "employee" under Title VII, § 2000e(f). Title VII excludes appointees on policy-making levels and advisers who are immediately and directly accountable to elected officials. *See, e.g., Teneyuca v. Bexar County*, 767 F.2d 148, 151–52 (5th Cir.1985); *E.E.O.C. v. Reno*, 758 F.2d 581, 584 (11th Cir.1985); *Curl v. Reavis*, 740 F.2d 1323, 1328 (4th Cir.1984); *Owens v. Rush*, 654 F.2d 1370, 1375–76 (10th Cir.1981); *Ramirez v. San Mateo County*, 639 F.2d 509, 513 (9th Cir.1981). Chief Wilson, who is not an elected official, testified at the preliminary injunction hearing that the deputy chiefs are accountable only to him."
*United States v. City of Montgomery*, 744 F.Supp. at 1078 n. 4.

11. Pierce–Hanna strenuously contends that, although she and the other three officers who prevailed in the first phase of the deputy-chief litigation offered to give up their immediate right to the position in return for a new selection process in which they and Owens could compete on a level field, they did not agree that Folmar and Wilson would participate in the new process; they argue that the court misunderstood their offer. Indeed, Pierce–Hanna notes that, by the order entered on January 14, 1987, Wilson agreed not to participate in any process which included an evaluation of her. Because the court concludes that Pierce–Hanna is entitled to the position, the court need not resolve this issue.

victim of unlawful retaliation. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

■ However, where, as in this case, a court has conducted a full hearing and has sufficient evidence to make a determination of whether an employee has been a victim of retaliation, the court need not go through the above burden-shifting process and should go ahead and reach the ultimate issue of retaliation. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Department of Education*, 854 F.2d 1285, 1290 (11th Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). The court does that here.[12]

In his August 13 letter to Mayor Folmar, Chief Wilson listed several reasons which he claimed justified his selection of Owens over Pierce–Hanna. Pierce–Hanna contends that these reasons are not only meritless, they are a pretext for Wilson's true retaliatory reason. As stated, the court has considered Pierce–Hanna's claim within the context of the defendants' history of invidious retaliation and discrimination and flagrant disregard for, and violation of, court orders. Furthermore, although Wilson states that the selection of Owens was his alone, the court has still considered Folmar's conduct and attitude toward Pierce–Hanna. The court's earlier comments on Folmar's critical role in Wilson's

rejection of Pierce–Hanna in 1989 remain true with regard to Wilson's rejection of her again in 1991. The court wrote that "Wilson would have been most reluctant to recommend to the mayor a candidate whom the mayor had openly considered to have been particularly 'disloyal' to him in these two lawsuits—someone such as Pierce–Hanna" because "such a recommendation would have been viewed by both Folmar and Wilson as a personal affront to the mayor." *United States v. City of Montgomery*, 744 F.Supp. at 1082. The court then concluded,

> "that Wilson considered this fact and intentionally sought to avoid such a situation; indeed, Wilson indicated as much when he testified that Owens was selected because he was not 'the center of controversy in any of these proceedings.' "

*Id.*

Set against this background, the evidence is overwhelming that Pierce–Hanna has again been a victim of retaliation. To begin, the reasons Wilson gave in his letter to Mayor Folmar for rejecting Pierce–Hanna do not withstand scrutiny. In the first phase of this litigation, Wilson rejected Pierce–Hanna because he "wanted someone unconnected with this litigation, someone who had not become controversial through his or her support for, or opposition to, these cases," *United States v. City of Montgomery*, civil action nos. 3739–N and 75–19–N at p. 6 (M.D.Ala. June 21, 1989)—in other words, "someone for depu-

---

12. In any event, Pierce–Hanna has established a prima facie case. She was an active participant in this litigation. Folmar and Wilson passed over her to select someone else as the new deputy chief. And the causal connection requirement is met by the fact that the defendants' refusal to promote her came shortly after her participation in these proceedings, in particular the first round of the deputy-chief litigation. *See Donnellon*, 794 F.2d at 601 (the short period of time between filing of discrimination complaint and discharge may establish causation). Schlei and Grossman, *Employment Discrimination Law*, 2d Ed., at 559 ("Closeness in time between the employer's knowledge of the protected ... participation and the adverse activity" may establish causation for purposes of a prima facie case). Moreover, the following evidence is surely sufficient to meet the causation require-

ment for purposes of a prima facie case: first, the long history of the defendants' retaliation against Pierce–Hanna and other officers connected with her litigation; and, second, Wilson's comments, described later in this memorandum opinion, about Pierce–Hanna's "attitude." These comments reflected that he was disappointed that Pierce–Hanna had refused to discontinue her litigation and this concern was a factor he considered in rejecting Pierce–Hanna. *See McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations"); *Barker v. International Brotherhood of Boilermakers*, 778 F.2d 750, 756 (11th Cir.1985) ("The requisites for a prima facie case in a Title VII suit are flexible").

ty chief who had not in the past participated in lawsuits challenging the employment practices of the police department," *United States v. the City of Montgomery,* 744 F.Supp. at 1080–81. Wilson's recent testimony reflects that he still harbors this bias against Pierce–Hanna. One of the reasons Wilson gave for rejecting Pierce–Hanna was her "attitude." [13] In response to a question as to what in Pierce–Hanna's "attitude" he viewed as "negative for this position," Wilson testified:

> "She is thoroughly convinced that she has myself, the city and anybody else in a position of non-compromise, and her unbending attitude on that, on this *campaign* that she's on, of I have been wronged and so I am going to carry it to the very end of the world. I'm sorry, but I regret that because I would sure like to work with her and I think that she possesses the ability to that."

(Emphasis added). Later in his testimony, Wilson denied that when he referred to her "campaign" he meant her litigation. It is apparent from his testimony, however, that

he meant just that; indeed there is no other reasonable explanation for the reference.[14] The court is therefore convinced that Wilson intentionally rejected Pierce–Hanna because of his disappointment that she has continued to pursue her litigation.[15]

A review of the other evidence reinforces this conclusion. Wilson stated that, according to the test administered by the Assessment Center, Owens scored higher than Pierce–Hanna in the areas of "organization and planning," "interpersonal performance," and "professional and technical performance." [16] Wilson said that he singled out these areas because "many" of the duties of deputy chief fall in these three areas and because "the majority of the duties deal with organization and planning." However, the department's own expert agreed that this was not a proper reason for selecting Owens over Pierce–Hanna. The Assessment Center tested all candidates in the following nine areas: (1) leadership, (2) judgment and decisionmaking, (3) interpersonal performance, (4) perception, (5) organization and planning, (6) stress and adaptability, (7) oral communica-

---

**13.** In his August 13 letter, Wilson gave as his third reason that:

> "I am aware from past experience, and from conversations with [the department's expert], that this type examination for selection is very capable of measuring basic qualifications. It is not, however, equipped to measure an individual's sincerity, resourcefulness, *attitude,* and motivation. Having absolutely nothing to do with race, religion, sex, or the filing of prior lawsuits I find that Major Owens, out of all of the candidates, exceeds in these areas."

(Emphasis added).

**14.** In contrast, Wilson testified how Owens's "attitude" was so much superior because of the approach he has taken to this litigation.

**15.** This testimony from Wilson could be viewed as "direct" evidence of his retaliation against Pierce–Hanna. *See United States v. City of Montgomery,* 744 F.Supp. at 1080 n. 12 ("direct evidence may be defined as actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee"). Under the framework announced by the Supreme Court in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), if a plaintiff presents direct evidence that retaliatory intentions played a substantial, motivating factor in the adverse employment decision, then the burden shifts to the

defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not allowed retaliation to enter into its decisionmaking process. *Id.* at 247, 259, 109 S.Ct. at 1788–89, 1795 (Brennan, J., plurality opinion); *id.* at 265–66, 276, 109 S.Ct. at 1798–99, 1804 (O'Connor, J., concurring in the judgment). *See also Jones v. Gerwens,* 874 F.2d 1534, 1539 n. 8 (11th Cir.1989). If the defendant fails to sustain this burden, then the plaintiff has established liability under Title VII.

Here, Pierce–Hanna has "produce[d] evidence sufficient to show that an illegitimate criterion was a substantial factor in the particular employment decision such that a reasonable factfinder could draw an inference that the decision was made 'because of' the plaintiff's protected status," *Price Waterhouse,* 490 U.S. at 278, 109 S.Ct. at 1805 (O'Connor, J., concurring in the judgment), and, for the reasons given in the text of this opinion, Wilson and Folmar have not met their responsive burden.

**16.** In his August 13 letter, Wilson gave as his first reason that:

> "Many of the duties of a Deputy Chief concern the areas of organizing and planning, interpersonal performance, and professional and technical performance which, according to the assessment center and *my own observations,* Major Owens excels over the candidate in the number one position."

tion, (8) written communication, and (9) professional and technical knowledge. No one candidate scored better in all areas than the other candidates. Pierce–Hanna scored higher than Owens in five areas and, Owens scored higher than she in three. Owens and Pierce–Hanna tied as to "perception." The department's expert testified that the Assessment Center assigned a relative weight to each of the nine areas based on what Wilson, as the selection plan's "subject-matter" expert, had told the Center. The expert said that, by giving more weight to the three areas Owens had excelled in, Wilson not only reweighed all the factors and thereby distorted the validity of the selection process, he essentially contradicted his own judgment since he was the one who initially gave the relative weights to the factors.[17] Moreover, it is suspect that the three areas Wilson singled out as particularly important to the deputy-chief job are the very same areas in which Owens excelled. The court is therefore convinced that Wilson was not looking to be objective in his assessment of the candidates, but rather was looking for reasons, after the fact, to justify his selection of Owens. This evidence not only undermines Wilson's testimony regarding his first reason for selecting Owens over Pierce–Hanna, it impeaches his motive and thus all his reasons for doing what he did.

Wilson stated that another reason he rejected Pierce–Hanna was because Owens has been with the police department longer than she.[18] Both Wilson and Mayor Folmar have repeatedly and adamantly maintained in this litigation that seniority is not a measure of ability and performance. Mayor Folmar has often summarized his opinion about seniority with the statement that, over a five-year period, one officer can gain five years of experience and another can have one year of experience five times over. Indeed, in 1984, Folmar issued a memorandum to all city departments stating that seniority "is not a factor in determining promotions or duty assignments." The department's own expert also agreed that seniority is not a good measure of a candidate's qualification. When confronted with this evidence, Wilson responded that seniority is an appropriate consideration when the candidates are "evenly balanced" and something is needed to "tip the scale." Wilson's response is not credible. If Pierce–Hanna and Owens were so evenly balanced that seniority had to play a factor, Wilson could have relied on a much better factor, one clearly tied to competency, to choose between the two candidates: the rankings given by the Assessment Center. Of course, the approach would have required that Wilson select Pierce–Hanna. Moreover, in his letter to Mayor Folmar, Wilson did not indicate that he was relying on seniority because the two candidates were equally qualified. Indeed, in his letter, Wilson makes essentially the opposite argument—that Owens is measurably and clearly more qualified than Pierce–Hanna. On the one hand, therefore, Wilson is saying that he fell back on seniority because Pierce–Hanna and Owens were so evenly balanced that he needed a tie breaker, but, on the other hand, he is saying that he selected Owens because he was clearly more qualified than Pierce–Hanna. From this conflicting evidence, it is again apparent that none of the reasons Wilson gave played a true role in his selection of Owens over Pierce–Hanna.

Wilson's letter strongly suggests that he also relied on experience as a basis of rejecting Pierce–Hanna. Wilson relied on this factor before when he rejected Pierce–Hanna in 1989, and, for the reasons the

---

17. As acting deputy chief, Owens was also permitted to serve as a "subject-matter" expert in the development of the selection process. Although it would appear unfair that Owens could be a subject-matter expert for a test he was to take himself, the department's expert found no problem with this and testified that Owens received no advantage over the other candidates, who had no similar input into the process. In any event, Pierce–Hanna out-performed Owens.

18. In his August 13 letter, Wilson gave as his second reason that:

> "Major Owens has been with the Montgomery Police Department since October 16, 1969—a total of 21 years and 10 months. This far exceeds Major Pierce–Hanna in tenure and experience."

court gave then, the court remains convinced today that this factor is not legitimate. Although Owens has served in both the traffic and the patrol divisions, Pierce–Hanna has served in the patrol, the juvenile, the jail administration, and the recruiting and training divisions. Moreover, Pierce–Hanna's experience has been in divisions that come under the department's "staff" side, over which the new deputy chief would supervise; Owens's experience, in contrast, has been on the "operations" side. *United States v. City of Montgomery,* 744 F.Supp. at 1086 & n. 19.

Because of the special circumstances of this case, the court is also deeply troubled by Wilson's reliance on subjective factors. In addition to "attitude," Owens excelled over Pierce–Hanna in the following areas, according to Wilson: sincerity, resourcefulness, and motivation;[19] trustworthiness and dependability;[20] and acceptance of responsibility and respect of subordinates.[21] As this court has stated previously, "One of the primary problems posed by subjective criteria in employment discrimination suits is that rigorous evaluation by the factfinder of the weight accorded these factors by the employer is extremely difficult." *United States v. City of Montgomery,* 744 F.Supp. at 1084. The Eleventh Circuit has noted before, in language applicable to the setting at hand, the difficulties encountered by courts in weighing an employer's proffered reliance on subjective criteria in justifying its employment decision:

> "This circuit has frequently noted the problems associated with this type of worker assessment and noted that subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal. The employee is left without any objective criteria to point to in order to show competence."

*Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir.1985) (citations omitted). *See also Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 1010, 108 S.Ct. 2777, 2797, 101 L.Ed.2d 827 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in the judgment) (cautioning, in a disparate-impact context, against "[a]llowing an employer to escape liability [under Title VII] by articulating vague, inoffensive-sounding subjective criteria"). Relying on this observation, this court has further written that, "Though *Miles* involved allegations of racial discrimination under Title VII, the appellate court's admonition to district courts to view with *caution* an employer's reliance on

---

**19.** *See* note 13, *supra.*

**20.** In his letter, Wilson described his fourth reason as follows:

> "During my tenure with the police department, I have worked closely with all of the candidates from time to time and I have always found Major Owens to be consistently trustworthy and dependable. On the other hand, during the time that Major Pierce–Hanna has been a member of the staff, I find that she has taken unusually excessive amounts of leave in one form or the other and is frequently away from her post. I have always found Major Owens to be available and up to date on all aspects of his job, both now and in past assignment as a Division Commander. He is seldom absent from his job for any reason."

**21.** Wilson described his fifth and final reason as follows:

> "Major Owens has held command positions in some of the largest and most demanding areas of responsibility within the police department. He has always exceeded in these positions beyond normal expectations. He accepts responsibility without question and has never shied away from a challenge. He has always received the respect of the subordinates he was supervising. Major Pierce–Hanna, on the other hand was offered the opportunity to take command of a larger division with more responsibility with no change in hours, off-days, or other benefits. She elected instead to remain in the position she currently holds. This offer to her was one of good will in an attempt to broaden her experience and to give her a larger area of responsibility. This leads me to the sincere belief that she is not up to the challenge, at this time, of accepting one of the single most important positions in the department."

subjective criteria applies with full force to the claim of retaliation in this case." *United States v. City of Montgomery,* 744 F.Supp. at 1084 (emphasis added). Furthermore, some of the subjective reasons Wilson gave—such as acceptance of responsibility and respect of subordinates—were not given by him when he selected Owens over Pierce–Hanna in 1989. *Id.* at 1083–86. The "fact that, as the court's scrutiny of his decision has progressed, Wilson has claimed to rely on new and different criteria is cause for *caution* " as well. *Id.* at 1084 (emphasis added).

This caution is especially justified here. There are a number of factors that lead the court to view with even more suspicion the subjective reasons put forward by Wilson: Wilson and Folmar have been personally involved as a defendants in this litigation; Wilson has candidly admitted at an earlier stage of this lawsuit that he could not be objective in evaluating Pierce–Hanna's performance within the department; Folmar has also made known his bias against Pierce–Hanna; Wilson still has displayed prominently in his office the public letter, which itself has served as basis for retaliation; and, of course, both Folmar and Wilson have been guilty of retaliation against Pierce–Hanna and of other flagrant violations of court orders.

Although this history by itself would warrant rejecting any subjective reasons Wilson might offer, the court need not rely on this history alone. As already shown, although "attitude" appears as a neutral factor in his August 13 letter, it turns out, after probing questioning of Wilson, that the true reason behind this subjective concern is Wilson's dislike for Pierce–Hanna's litigation. Under these circumstances, the court cannot comfortably accept any of Wilson's subjective reasons.

Admittedly, Wilson gave some examples which he claimed supported his subjective assessment. For example, Wilson stated the following in support of his conclusion that Owens is more "trustworthy and dependable" than Pierce–Hanna: "during the time that Major Pierce–Hanna has been a member of the staff, I find that she has taken *unusually · excessive* amounts of leave in one form or the· other and is frequently away from her post." (Emphasis added). Wilson testified that he reviewed both Pierce–Hanna's and Owens's personnel files before reaching this conclusion. Wilson admits, however, that he did not compare Pierce–Hanna's attendance record with other officers in general; thus, he has no basis for his conclusion she has taken "unusually excessive" amounts of leave. Moreover, the court is convinced that Wilson pulled Pierce–Hanna's file in order to scrutinize it for reasons to reject her. Wilson's initial explanation as to why he reviewed only Pierce–Hanna's and Owens's files is telling:

"Question: Why would you only consider the first two candidates?

"[Wilson]: Well, at this particular time, you had one person rated Number 1, and *I don't know how to skip them without a valid reason.*"

(Emphasis added). Furthermore, although Pierce–Hanna has, in fact, taken more leave than Owens, the court is not convinced that this one factor alone would have led Wilson to reject the rankings to select Owens over Pierce–Hanna.

In his letter, in support of his asserted conclusion that Owens "accepts responsibility" better, Wilson stated that, because Pierce–Hanna had turned down the command of a division larger than her current one, she is not "up to the challenge." Pierce–Hanna turned down the Records and Communications Division because most of its staff consists of women and civilians and because most of its work was of a type commonly assigned to women, work of a secretarial nature and with computers. She viewed the offer as neither a challenge nor an opportunity for advancement, but rather as a further effort by Wilson to restrict her by placing her, in her words, in "a female job." Pierce–Hanna asked instead to be commander of the prestigious Patrol Division but Wilson refused. She has also stated to Wilson that, when the Training Division is recombined with her division, she would like to be head of the combined divisions. The court agrees with

Pierce–Hanna that Wilson ·was not really offering her a challenge.

Wilson stated in his letter recommending Owens that Owens always enjoyed "the respect of the subordinates he was supervising," thereby implying that Pierce–Hanna did not enjoy equal respect. The court does not find Wilson's testimony credible. Indeed, one of the areas in which Pierce–Hanna exceeded all other candidates was in "leadership," which the Assessment Center defined to include the ability "to interact with subordinates in a manner that ... commands respect." Wilson also stated, in support of his reasons, that Owens has always been "up to date on all aspects of his job." The court credits Pierce–Hanna's testimony that she has been equally current in her job.

The manner in which Chief Wilson chose Owens over Pierce–Hanna further undermines Wilson's. proffered reasons. Wilson admits that, although he compared Pierce–Hanna, the number-one-ranked person, with Owens, the number-two-ranked person, to determine who he personally considered to be better qualified, he did not, after he had determined that Owens was better qualified, then compare Owens with a lower-ranked person to determine who was better qualified. If Wilson had been truly endeavoring to choose the best qualified of the five top candidates, he would have used the same criteria, set forth in his reasons for rejecting Pierce–Hanna, to compare Owens with lower-ranked candidates. The court is convinced, based on the Wilson's long history of retaliation against Pierce–Hanna and others associated with her, that the only reason for this difference in treatment is the fact that Pierce–Hanna has participated in this litigation and Owens has not. As the Eleventh Circuit Court of Appeals has observed: "uneven application of criteria is strong evidence that the

criteria were never in fact employed in the selection process and were used by the employer as merely a pretext for discrimination." *Thompkins v. Morris Brown College,* 752 F.2d 558, 564–65 (11th Cir. 1985), *quoting Sims v. Montgomery County Commission,* 544 F.Supp. 420, 426 (M.D.Ala.1982). ·Wilson should have treated Pierce–Hanna the same way he treated Owens: he should have selected her on the force of her ranking alone.[22]

The court must also reject Wilson's reasons because it appears that he has included in his assessment the experience and opportunities Owens gained since he became acting deputy chief. For example, Wilson says that he selected Owens because he was especially "trustworthy," and Wilson gives as an example how Owens has handled "internal affairs" since he became acting deputy chief. Pierce–Hanna, of course, has not had a comparable opportunity to display her abilities. The court has made clear again and again throughout this litigation that Owens must not be advantaged in any way in the selection process by the fact that he has served as acting deputy chief. Wilson has not abided by this directive.

The court also cannot overlook Wilson's recent display of bad faith toward Pierce–Hanna as she has sought full but fair vindication of her own rights. As stated earlier, although Pierce–Hanna and three other officers won the first round of litigation and thus were entitled to have the new deputy chief immediately chosen from among them, they agreed instead to a new selection process in which Owens could also compete and during which Owens would continue as acting deputy chief. Wilson repaid this magnanimity upon Owens's reappointment by immediately paying Owens $7,000 in backpay through September

---

**22.** Wilson suggests that he limited his comparison to Owens and Pierce–Hanna because, after reviewing her file, he found that she was "excessively absent." The court does not find Wilson's explanation credible for two reasons. First, for reasons already given, the court is convinced that Wilson pulled Pierce–Hanna's file in order to find reasons to reject her, and the court is not convinced that Pierce–Hanna was "excessively

absent." But second and more convincingly, Wilson did not select Owens over Pierce–Hanna merely because Pierce–Hanna was excessively absent. According to his letter, he employed many other criteria, and Wilson has not convincingly explained why these other criteria were not used to compare Owens with candidates ranked lower than he.

1989 even though: Wilson was certain that Pierce–Hanna would file a court challenge to the selection; ¶ 7 of the selection plan expressly provided that "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge"; and the Montgomery City–County Personnel Board had refused to confirm the reappointment because the board believed the reappointment violated ¶ 7. Wilson surely knew that, if his actions were not contemptuous, they bordered on it. In the face of this display of bad faith, the court is reluctant to credit his word.

In conclusion, the court finds that the reasons Wilson gave in his August 13 letter, viewed singly and together, are pretextual, and that Wilson chose Owens over Pierce–Hanna because of Pierce–Hanna's unrelenting pursuit of this litigation over the years—what Wilson called her "campaign." The court is convinced that, in the absence of this litigation, Wilson would have chosen Pierce–Hanna to be the new deputy chief over the police department's staff side.

2. The *Teamsters* and *Franks* Approach

In *Teamsters* and *Franks*, the Supreme Court of the United States suggested another means by which a Title VII plaintiff may prove her case: by establishing a pattern and practice of illegal conduct. In a pattern-and-practice case, the plaintiff has the initial burden of showing that the unlawful conduct was the employers' "standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. The plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* The plaintiff must instead prove "a systemwide pattern or practice." *Id.* If the plaintiff meets this burden, a rebuttable presumption arises that the plaintiff was a victim of discrimination and the burden shifts to the employer to prove that the plaintiff was, in fact, not a victim. *Id.* at 359, 97 S.Ct. at 1866; *Franks*, 424 U.S. at 772, 96 S.Ct. at 1268. "The employer may overcome this presumption only with *clear* and *convinc-*

*ing* evidence that job decisions made when the discriminatory policy was in force was not made in pursuit of that policy." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir.) (emphasis added), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

The evidence is overwhelming that retaliation against Pierce–Hanna and those identified with her in this litigation has been and continues to be the standard operating procedure in the City of Montgomery Police Department. Furthermore, for the reasons already given by the court, the defendants have failed to show by clear and convincing evidence that, absent this policy, Pierce–Hanna would not have received the deputy-chief appointment.

## II. GAMBLE'S CLAIMS

█ Because Mayor Folmar and Chief Wilson did not pass over Gamble when they selected Owens, Gamble could not file a claim under the deputy-chief interim-selection plan. Nevertheless, on January 3, 1992, the court allowed Gamble to intervene in this litigation and file his own complaint.

Gamble ranked last among the top five candidates for the deputy-chief position. He has nevertheless leveled several challenges to Chief Wilson's selection of Owens as the new deputy chief. First, Gamble contends that Wilson failed to comply in full with the selection plan. He notes that the plan, as ordered by the court on August 3, 1990, includes the establishment of a seven-member committee to work with a four-member panel of experts. The court charged this seven-member committee with the following responsibilities:

"(4) The seven-member committee and the four-member panel shall develop procedures for screening, interviewing, evaluating, and ranking candidates. The committee and the panel shall include in their procedures those measures necessary to offset as much as is practicable any advantage Major Roger Owens may have acquired as acting deputy chief.

"(5) The seven-member committee shall screen, interview, and evaluate all candi-

dates for the deputy chief position in accordance with the procedures required in paragraph numbered (4).

"(6) The seven-member committee shall submit to the Mayor of Montgomery the names of the top five candidates, ranked in order of preference by the committee in accordance with the procedures required by paragraph numbered (4)."

Gamble claims that police department's failure to establish the seven-member committee violated the selection plan. The court does not agree. After the adoption of the plan, Folmar and Wilson suggested to the court that the rankings of the candidates should be done under the auspices of the Miami–Dade Criminal Justice Assessment Center. The court approved this new procedure and assumed that it would replace the seven-member committee. Because the Center was to perform the same functions as the committee, the reintroduction of the committee would have been redundant.

Gamble also complains that the Assessment Center failed to meet the court's directive that the selection process provide for measures which will discount as much as possible any training and experience Owens has received while serving as acting deputy chief. The court agrees with Gamble that the Center was not able to achieve this objective completely: indeed, the evidence reflects that it may have been an impossible task.[23] In any event, the issue is moot. With the order entered today, Pierce–Hanna is to become the new deputy chief. Gamble has not complained that Pierce–Hanna's number-one ranking was due to any deputy-chief training or experience that she received unfairly.

Gamble further complains that the Assessment Center's selection process was defective because it failed to take into ac-count that he had "suffered effects from a discriminatory and unlawful policy by the State of Alabama of segregated school education." Gamble has not shown, however, that either the City of Montgomery, Mayor Folmar, or Chief Wilson was responsible for these effects and he has not suggested how the court can hold them legally accountable absent such responsibility. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (Title VII "does not command that any person be hired simply because he was formerly the subject of discrimination"). But more importantly, this claim comes too late. As a class member, Gamble has been directly involved with the deputy-chief aspect of this litigation since 1989. Not until after the Assessment Center had completed its work did he raise this issue.

Gamble further complains that the Assessment Center failed to consider the "lack of opportunity" he has suffered while "serving in a retaliatory assignment as administrator of the Montgomery City Jail, in which position there is little or no opportunity to develop professionally as a leader in police work." Gamble is tardy as to this issue also. It is too late to raise this issue, now that the Assessment Center has completed its work.

Finally, Gamble charges that Chief Wilson refused to select him as the new deputy chief because of his race and because of his past participation in this litigation. The evidence reflects that Gamble is African–American and has engaged in statutorily protected activity.[24] His protected activity includes: first, his active participation as a member of the class of black officers; second, his participation in the first round of the deputy-chief litigation; and, third, his pursuit in 1988 of a claim, later settled,

---

**23.** The police department's expert testified that, because Owens was not tested before he became acting deputy chief on the abilities and qualities desired in a deputy chief, there is no way to be certain that he, in fact, did not receive an unfair advantage in the selection process from having served as acting deputy chief for over two years. The expert said, however, that he believes Owens had no advantage. The court nevertheless has its doubts.

**24.** Gamble relies on the anti-retaliation provision in Title VII, 42 U.S.C.A. § 2000e–3(a), *see* notes 1 & 9, *supra,* and on the court's order of October 2, 1972, in *United States v. City of Montgomery,* civil action no. 3739–N, prohibiting retaliation in any manner against city employees participating in this litigation. As with Pierce–Hanna, the court has treated his claim as falling under only Title VII.

charging that city officials retaliated against him because he had refused to join them in a scheme to retaliate against Pierce–Hanna for her role in this litigation. *United States v. City of Montgomery*, 744 F.Supp. at 1077.

Applying the *Burdine* and *McDonnell–Douglas* approach, the court is convinced that although Wilson and Folmar are biased against Gamble because of his participation in this litigation, *see United States v. City of Montgomery*, 744 F.Supp. at 1081–87 (discussing how Folmar and Wilson have retaliated against Gamble in the recent past), they clearly would have rejected him in the absence of this bias. He not only ranked last among the top five candidates, he scored lower than Owens in all nine areas tested. Folmar's and Wilson's bias played no role in their rejection of Gamble.[25] Furthermore, assuming that Gamble is entitled to a presumption of retaliation based on the approach outlined in *Teamsters* and *Franks*, the court is similarly convinced that, because of his low ranking and, relatively speaking, poor performance on the test, Folmar and Wilson have met their burden of showing by clear and convincing evidence that Gamble has not been a victim of retaliation. Finally, the court finds no evidence whatsoever that race played a role in Folmar and Wilson's actions toward Gamble.[26]

### III. RELIEF

As stated before, if there is a challenge to a selection made under ¶ 7 of the deputy-chief selection plan, "the mayor may not select the lower-ranked candidate unless and until the court rules in the mayor's favor on the challenge." This provision was based on the court's expressed concern that "should there be a challenge to Mayor Folmar's selection, the court did not want the person the mayor selected to acquire any vested interest in the position such that the court would be reluctant to remove him or her should the court find in favor of the challenge." *United States v. City of Montgomery*, civil action nos. 3739–N & 75–19–N at p. 12 (M.D.Ala. October 3, 1991). Because the court has found in favor of Pierce–Hanna's challenge, the defendants will be required to vacate immediately the appointment of Owens as acting deputy chief and to appoint Pierce–Hanna immediately as permanent deputy chief, retroactive to September 29, 1989. Pierce–Hanna shall have all the duties, responsibilities, authority, and perquisites that have normally and traditionally attended the position. She is also entitled to such backpay and other back employment benefits as she would have received had she not been illegally denied the deputy-chief appointment. She is also entitled to reasonable attorney's fees and expenses. The court will give the parties a reasonable period of time to agree on backpay and other back benefits and on attorney's fees and expense. The court will deny all relief to Gamble.

### IV. CONCLUSION

Pierce–Hanna could have had the deputy-chief position three years ago. If she had asked the court to choose from among the four complaining officers who prevailed in the first round, the court would have chosen her because she was unquestionably the most qualified. Yet with a display of remarkable strength and forbearance, she chose to use this litigation not for herself but rather for the benefit of all majors and thus the department itself. Assuredly, she also wanted to prove to doubters that, under any test the police department could

---

**25.** The court would reach the same result applying the *Price Waterhouse* approach. *See* note 15, *supra*.

**26.** At one point, Gamble claimed that the court should require that defendants seek reimbursement from Owens of the $7,000 in backpay Wilson and Folmar improperly authorized him to receive. After all evidence had been received, the court allowed Owens to intervene in this litigation for the limited purpose of chal-

lenging Gamble's reimbursement claim. *See* Owens's complaint-in-intervention filed on December 2, 1991. Because Gamble has now withdrawn the request, Owens's intervention is now moot.

Although Pierce–Hanna believes that Owens received the money in violation of the court's selection plan, she has not requested that he reimburse the City of Montgomery.

construct, she would still come out on top. She therefore agreed to the creation of a new, open, and fair process in which all majors, including Owens, could compete. As she believed would happen, the scorers under the new process ranked her number one. Nevertheless, she has had to turn once again to this court to seek redress because the defendants have once again illegally denied her the deputy-chief position in retaliation for her litigation. It is now time she receive the prize she has won not once but twice.

The court shall enter an appropriate judgment.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the challenge to the deputy-chief selection, filed by plaintiff-intervenor Sandra Pierce–Hanna on August 23, 1991, be and it is hereby sustained;

(2) That judgment be and it is hereby entered in favor of plaintiff-intervenor Pierce–Hanna and against the defendants, the City of Montgomery, Alabama and its mayor and police chief;

(3) That the defendants, the City of Montgomery and its mayor and police chief, and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing to do the following forthwith:

(a) Vacating the appointment of Major Roger Owens as "acting deputy chief" of the Police Department of the City of Montgomery, Alabama; and

(b) Appointing plaintiff-intervenor Pierce–Hanna, retroactively to September 29, 1989, to the deputy-chief position which Major Owens has occupied on an "acting" basis;

(4) That it be and it is hereby DECLARED that plaintiff-intervenor Pierce–Hanna shall have all the duties, responsibilities, authority and perquisites that have normally and traditionally attended said deputy-chief position; and

(5) That plaintiff-intervenor Pierce–Hanna have and recover from the defendants, the City of Montgomery and its mayor and police chief, such backpay and other back employment benefits she would have received had she not been illegally denied appointment to the position of deputy chief in 1989;

(6) That plaintiff-intervenor Pierce–Hanna have and recover from the defendants, the City of Montgomery and its mayor and police chief, reasonable attorney's fees and expenses;

(7) That, if the parties cannot agree on appropriate backpay and other back employment benefits, plaintiff-intervenor Pierce–Hanna is allowed 28 days from the date of this order to file a request for the court to determine these benefits; and

(8) That, if the parties cannot agree on reasonable attorney's fees and expenses, plaintiff-intervenor Pierce–Hanna is allowed 28 days from the date of this order to file a request for the court to determine such fees and expenses.

It is further ORDERED that judgment be and it is hereby entered in favor of the defendants, the City of Montgomery, Alabama and its mayor and police chief, and against plaintiff-intervenor James E. Gamble, with plaintiff-intervenor Gamble taking nothing by his complaint-in-intervention filed on January 3, 1992.

The clerk of the court is DIRECTED to issue a writ of injunction.

The United States Marshal or his representative is DIRECTED to serve on the City of Montgomery, Alabama and its mayor and police chief a copy of the memorandum opinion and the judgment and injunction entered this day.